[No. S081479. Jan. 31, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD WAYNE MOORE, Defendant and Appellant.

388

COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Arnold A. Erickson, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Alice B. Lustre and Catherine McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—Ronald Wayne Moore was convicted of and sentenced to death for the 1998 murder of 11-year-old Nicole Carnahan, which occurred

during the commission of burglary and robbery. (Pen. Code, §§ 187, 190.2, subd. (a)(17).) On automatic appeal, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

*Guilt Phase Evidence*

*Prosecution Evidence*

Rebecca Carnahan lived with her daughter, Nicole, on Middlefield Road in Salinas. Defendant was their next-door neighbor. Carnahan was not friendly with defendant, had never invited him into her home, and had told Nicole to ignore him.

Carnahan worked during the day; Nicole, 11 years old when she was killed, took the bus to school and back. Nicole typically arrived home shortly after 3:00 p.m., let herself in with a front door key and, after changing her clothes, fed the animals she was raising in the backyard, had a snack, and started her homework. She always relocked the front door and had been told not to let anyone in, but she did not always relock the back door after tending the animals.

On the day of her murder, March 4, 1998, Nicole left for school around 7:00 a.m., and Carnahan went to work an hour later. Before leaving, Carnahan went into the backyard to feed the animals; at that time, she saw no holes in the wood fence between her property and defendant's. At 2:15 p.m., a neighbor noticed two or three boards were missing from the fence. When Carnahan returned from work a little after 5:00 p.m., Nicole did not come out to the car to greet her as usual and did not answer her knock at the front door, which (unusually) was deadbolted.

Carnahan went around to the back door, which she found unlocked and ajar. The house had been ransacked, "turned upside down," with things thrown about and the telephone cords pulled from the walls. She did not see Nicole. After less than a minute, Carnahan returned to the back door. She saw defendant running away from her toward the back pasture, a bundle of some sort tucked under his arm. She yelled after him, but he ran to a hole in the fence and went through it. Through the fence she asked him what was going on and where Nicole was, to which he eventually responded, "I didn't do it."

After calling the police from a neighbor's house, Carnahan returned to her backyard, where she again saw defendant through the fence. Asked if he had seen Nicole, defendant replied that he had seen "two Mexicans" in Carnahan's yard and had tried to chase them away. While Carnahan waited

by the road with neighbors for the police to arrive, defendant approached (carrying a can of Budweiser Light beer, the same brand Carnahan had had in her refrigerator) and told Carnahan that he had gone to her house to ask Nicole for a glass of water because he did not have any.

A responding Monterey County deputy sheriff, Larry Robinson, followed a trail in the unmown grass in Carnahan's yard, though the hole in the fence, to a trailer in which he found defendant. Defendant said he had seen Nicole earlier at her back door; she had given him a drink of water and caught him when he started to fall. Robinson noticed a can of beer in defendant's trailer; it was cold to the touch even though there was no electricity in the trailer. In defendant's yard Robinson saw a guitar case, which drew his attention because, unlike the many other objects lying around the yard, it was clean and unweathered.

Some minutes later, Deputy Robinson asked to interview defendant in his patrol car, as defendant's trailer was cold and dark. Defendant agreed to be interviewed. He told Robinson "a couple of guys" had "tried to rob[]" him; he had heard from one neighbor of someone "crawling around" in her backyard and from another neighbor, Dennis Sullivan, that Sullivan had chased away two "Mexican guys" who had tried to break into his house.[1] Defendant then saw the hole in Carnahan's fence and went to warn her about the prowlers and to tell her about the missing boards. Nicole gave him a drink of water and caught his arm when he became dizzy. Later he saw a Mexican man in Carnahan's yard; the man ran off when defendant called to him, and defendant, who could not run because of "Lou Gehrig's disease," was unable to catch him. When Carnahan arrived in her backyard, defendant urged her to call the sheriff's office. After the interview, as defendant was still sitting in Robinson's patrol car, Carnahan began screaming. Defendant first seemed to ignore her, then asked, "Did they find her?"

Defendant agreed to go to the sheriff's station and give a statement. At the station, he repeated much of what he had told Deputy Robinson. He added that he had talked to Nicole at Carnahan's back door and had not entered the house. He gave a more detailed description of the "Mexican" man he claimed to have seen in Carnahan's backyard, specifying his hairstyle and clothing. He also said the stranger had run toward the back of Carnahan's property, not toward the hole in the fence along defendant's property line. Defendant also told the deputy he carried a "butcher's knife" in his waistband as well as a

---

[1] Sullivan testified he did not tell defendant two men had tried to break into his house. Rather, he mentioned to defendant that a field worker looking for work had knocked on his front window and looked in. Sullivan also testified defendant had a butcher knife and a pipe-like cylinder with him when he came to Sullivan's house on the afternoon of Nicole's death.

piece of pipe he called his "club," but he did not have the knife when he went to Carnahan's. When the deputy told defendant Nicole had been killed and asked if he was responsible, defendant said he could not have killed her because his degenerative muscular illness made him too weak.[2]

Nicole's body was found stuffed between her bed and the wall of her bedroom. She had suffered numerous wounds, the gravest of which were a four-inch slash wound to her neck that severed her jugular vein and carotid artery (a broken knife blade remained lodged in this wound), and a blunt force injury to her head (inflicted by one extraordinarily heavy blow or by several strong blows) that severely fractured her skull, resulting in laceration to her brain. Other injuries included a set of lacerations on her face and head that were deep enough to reach the underlying bone, a set of bruises on her face that could have been inflicted by the piece of pipe defendant said he had been carrying earlier in the day of Nicole's death, and a set of apparently defensive wounds on Nicole's hands and wrists.

Nicole's blood was found spattered throughout her bedroom—on the wall, ceiling, windowsill, furniture, bedclothes, carpet and other objects—although the greatest concentration of blood was near her body. There was a single bloodstain on the living room floor. Blood was also found in several areas and on objects in defendant's trailer, including still damp blood on a broken cane, smears on a light switch and in the bathroom, and on a poncho and a pair of gloves. DNA analysis identified the blood as virtually certain to be Nicole's.

Carnahan identified numerous items taken from her house and found in defendant's house or trailer, including several pieces of jewelry, an antique pocketknife, food and beer, a lamp, a telephone and answering machine, $2 bills she and Nicole had been saving, collectible coins, bottles of bubble bath, a guitar, and stereo equipment.

### Defense Evidence

On the afternoon of Nicole's murder, a woman visiting her daughter in defendant and Carnahan's neighborhood saw a male "Hispanic teenager" walking in the street.

Analysis of defendant's blood and urine taken after his arrest indicated he had consumed marijuana, cocaine, heroin, methadone and valium within

---

[2] The prosecution introduced evidence defendant had been seen walking, riding a bicycle, doing pushups, and climbing into and out of a dumpster without observable difficulty, but there was also evidence he sometimes used a cane, walked "hunched over," and, in jail, used a wheelchair.

hours or days of the sample being taken. David True, an HIV-prevention educator with the Monterey County AIDS Project, saw defendant about 5:00 p.m. on March 3, 1998, the day before Nicole's murder. Defendant was agitated, under the apparent influence of an opiate, and "a little bit out of control."[3]

### Penalty Phase Evidence

### Prosecution Evidence

The People presented evidence of three prior incidents involving violence. In 1983, defendant and others burglarized a wholesale nursery business. The evidence suggested defendant shot twice at the owner before being shot by him. In 1997, defendant accosted a man he knew outside a methadone clinic, threatening him with a cane and a switchblade. Finally, in March of 1998, two days before the capital crimes, one of defendant's neighbors heard him arguing loudly with two women, then saw him pull and drag one of the women back to his trailer when she started to leave.

Both Nicole's parents testified regarding Nicole's life, activities and hopes, and the impact her death had had on them. A criminalist who had testified at the guilt phase gave further testimony on the bloodstain and spatter evidence in Nicole's bedroom. He concluded blows had been struck to Nicole's head both near her closet and, possibly, in another corner of the room.

### Defense Evidence

Louise Moore DeMateo, defendant's sister, described their generally happy childhood, ending with defendant's heavy drug use, which began when he was 19 or 20 years old. She remained close to defendant and tried to help him, taking him to methadone treatments and visiting him and his family during the time he lived with his wife and children. After his marriage ended and his wife took custody of the children, defendant lived in a trailer on his mother's Middlefield Road property. He continued to use heroin and marijuana and developed a physical disability that involved difficulty walking and maintaining his balance. Defendant designated DeMateo his payee for disability benefits, but in the autumn of 1997 he revoked that designation at the instigation of a woman named Ladell, who was living with him. On Christmas Eve, 1997, DeMateo and defendant's mother, who was not living on the property at the time, asked DeMateo to bring defendant some food;

---

[3] In rebuttal, a psychopharmacologist testified that the level of morphine shown in defendant's blood analysis was "not particularly high" for a regular heroin user. From a review of defendant's arrest records and the pharmacology report, the witness found no signs of drug-induced delirium or psychosis.

she tried, but Ladell and others would not let her into the house until she obtained the assistance of the sheriff's office.

Two of defendant's daughters testified to his care for them as small children and their love for him.

Two experts, neurologist Arthur Kowell and neuropsychologist Dale Watson, examined, tested and interviewed defendant. Kowell found evidence of brain dysfunction in defendant's frontal and temporal lobes, which could cause problems in emotional function, impulse control, memory, and the ability to exercise the will to change. Watson's testing showed mildly impaired brain function with a significant deficit in the ability to maintain attention. Though these deficits did not cause defendant to kill Nicole, they could have influenced his judgment and behavior, and his ability to organize and to make decisions.

*Verdicts and Sentence*

In the guilt phase, the jury returned verdicts of guilty on the charges of first degree murder, robbery and burglary (Pen. Code, §§ 187, 189, 212.5, subd. (a), 459)[4] and found true the allegations that the murder was committed during the commission of first degree robbery and burglary (§ 190.2, subd. (a)(17)) and that defendant used a deadly weapon in the commission of the murder and robbery (§ 12022, subd. (b)). The court found true the allegation defendant had served two prior prison terms. (§ 667.5, subd. (b).) In the penalty phase, the jury returned a verdict of death. The court sentenced defendant to death for the murder and to a prison term of 11 years four months on the remaining charges and allegations; execution of the prison term was stayed pending execution of sentence on the murder charge.

## DISCUSSION

### I.  *Motion to Suppress Defendant's Statements to Police*

Defendant moved to suppress statements he made to police, beginning with those he made to Deputy Robinson in his patrol car and including those made en route to and at the sheriff's station, on grounds he was in police custody but was not advised of his rights before questioning, as required by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). The trial court, finding defendant was not in custody until he was formally arrested and given *Miranda* advisements, denied the motion.

▮ An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when "a person has been taken into custody or otherwise

---

[4] All further unspecified statutory references are to the Penal Code.

deprived of his freedom of action in any significant way." (*Miranda, supra,* 384 U.S. at p. 444.) Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400 [58 Cal.Rptr.3d 368, 157 P.3d 973]; *People v. Boyer* (1989) 48 Cal.3d 247, 271 [256 Cal.Rptr. 96, 768 P.2d 610].) When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. (*Boyer,* at p. 272.) All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present. (*Ibid.*)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard, supra,* 40 Cal.4th at p. 1400.)

We examine in sequence each of the three sets of statements defendant claims should have been excluded—those made in the patrol car parked at the scene, in the patrol car en route to the sheriff's station, and in an interview room at the sheriff's station.

### A. *Patrol Car Interview*

Sheriff's Deputy Robinson testified that after he talked briefly with defendant at defendant's trailer and searched the trailer, he asked if defendant would talk with him further in the deputy's patrol car. Deputy Robinson chose the patrol car over defendant's residence because night was beginning to fall, it was getting cold and dark, and the trailer had no electricity. Defendant agreed. Robinson was in uniform and carrying a firearm, but he did not draw his weapon or handcuff or patsearch defendant before interviewing him in the patrol car. Defendant was not a suspect; Robinson considered him an important witness because he had said he had seen the victim that afternoon. Though the back doors of the patrol car automatically locked when closed, defendant would have been permitted to leave had he sought to do so.

At the beginning of the taped interview, defendant said that he "would invite you guys in if I had, uh, had power." He seated himself in the vehicle's backseat and asked for the windows to be rolled up. Before he was even

asked a question, defendant volunteered that a neighbor, Ms. Hooper, had "seen somebody . . . crawling around in the back" at night. Deputy Robinson then questioned defendant about when he noticed the fence boards were missing, what Dennis Sullivan had told him about "two Mexican guys" on Sullivan's property, defendant's contact with Nicole when he went to warn Carnahan about the prowlers and the missing boards, and the man he had seen in Carnahan's backyard. None of Robinson's questioning contained express or implied accusations against defendant.

At the conclusion of the interview, which lasted less than 15 minutes, Robinson told defendant he appreciated his cooperation and asked him to "hang tight" for a short time. Robinson left the car. When he returned a few minutes later, defendant was still sitting in the backseat, but the door was open. Defendant's feet were outside the car, and he was smoking a cigarette.

That the patrol car interview was not custodial is clear. Defendant's participation was requested and readily given. The location was chosen because the alternative, defendant's residence, was cold and dark; defendant himself agreed it was not suitable. No indicia of arrest were present. Defendant was neither searched nor handcuffed. No evidence indicated he knew the car doors were locked, and the windows were closed only at his request; later a back door was opened, and defendant partly exited to smoke a cigarette. The interview itself was short, and the questions focused on information defendant had indicated he possessed rather than on defendant's potential responsibility for the crimes. Nothing in the interview or its circumstances, in short, would have led a reasonable person to think he was not free to end the questioning and leave. (*People v. Leonard, supra*, 40 Cal.4th at p. 1400.)

### B. *Conversation en Route to Sheriff's Station*

After defendant, sitting in the patrol car's backseat with the door open, had smoked a cigarette, sheriff's investigator John Hanson approached to speak with him. Hanson confirmed that defendant had seen the victim earlier that day and asked: "[W]ould you volunteer to come down to the station and talk to me? I need to take a real detailed statement about it." Defendant asked, "Right now?" and, when Hanson answered affirmatively, further asked, "[C]an we do it in the morning?" Hanson responded, "No, we have to do [it] now." Hanson twice assured defendant he would be given a ride back home, and defendant said, "Okay" and "Very good."

Sheriff's Deputy Michael Shapiro then drove defendant to the station, using the same patrol car in which defendant had been interviewed. He did not handcuff or pat down defendant before they both got into the vehicle.

Shapiro did not attempt to interview defendant while transporting him, but the two did engage in conversation. Just as they left the scene, defendant asked why Carnahan was screaming, to which Shapiro answered he did not know. Defendant observed Carnahan had been upset at the length of time the sheriff's department had taken in responding to her call, and Shapiro noted that "she really gave me a hard time" on a previous occasion, when he had responded to a call on a domestic matter. Defendant said he had been getting along "pretty good" with Carnahan, but that she had a temper, which he had heard displayed in arguments with her boyfriend, Mike. The arguments, defendant suggested, were prompted by a "Black guy" renting a unit in the back of Carnahan's property. Without being questioned, defendant also mentioned that Dennis Sullivan had said two men had tried to rob him, that there were "a couple of guys going around doing burglaries," that he, defendant, always tried to get along with his neighbors and was unable to run and lift heavy objects because of Lou Gehrig's disease, and that Nicole "seemed all right" when he saw her earlier that day.

Beyond that, the conversation ranged over several topics, including Sullivan's business and back problems, defendant's previous burglary sentence and the shooting injury he had sustained during the burglary (a topic defendant raised), the prognosis for defendant's illness, an AIDS test defendant had just had, and how defendant kept food fresh without electricity (in a small ice chest). At one point, defendant asked Shapiro for an assurance he would not have to walk back from the sheriff's station; Shapiro answered, "Oh, no. No-no-no-no-no. We'll give you a ride back." On arriving at the station, defendant asked, "You guys just want a statement?" Shapiro answered, "Yeah," and "They're just going to talk to you, that's all." Defendant said, "Okay."

As with the patrol car interview, Deputy Shapiro's conversation with defendant en route to the station was plainly not a custodial interrogation. There were, as before, no indicia of arrest. Defendant had told several people, including Deputy Robinson and investigator Hanson, that he had seen the victim in the afternoon, not long before she was killed. Obviously an important witness, defendant was asked to go to the station voluntarily to give a statement. Though he apparently would have preferred doing so later, he acceded to Hanson's reasonable explanation that time was of the essence. His only other reservation—the need for assurance he would be given transportation home when finished—having been satisfied, he agreed. Deputy Shapiro did not interrogate defendant during the ride; defendant was at the least an equal partner in initiating and maintaining the conversation, which ranged widely in subject matter. On arriving at the station, defendant sought confirmation that the officers only wanted a statement and would drive him home afterward. Receiving that confirmation, he again agreed to give the

statement. Nothing indicates defendant thought he was not free to leave during the ride to the station, and no reasonable person would have thought so in these circumstances.

### C. *Sheriff's Station Interview*

On arriving at the station, Deputy Shapiro escorted defendant to the investigations section. Defendant was taken to an interview room, where he was interviewed by investigator Hanson, later joined by investigator Ed Lorenzano. The interview was audio- and videotaped. Hanson testified defendant was not handcuffed or otherwise restrained and he, Hanson, was not wearing a gun. The interview room door locked automatically when closed, but Hanson recalled that investigator Lorenzano, who came and went during the interview, either left his keys in the door or placed a wedge to keep it from closing and locking.

After getting some background information about defendant, Hanson opened the interview by reiterating that defendant was "not under arrest or anything" and was there only to make a statement because he was the last person known to have seen the victim. Defendant said he understood he was not under arrest, and Hanson repeated that defendant had been brought to the station only for a statement and was "free to go or whatever."

Hanson questioned defendant about Carnahan and Nicole, defendant's earlier meeting with Dennis Sullivan, his visit to the Carnahan residence, and his interaction with Nicole. As in the patrol car interview with Deputy Robinson, defendant said Sullivan had told him of an attempted burglary, he noticed the missing fence boards, and at 2:00 or 2:30 p.m. he went to Carnahan's to warn her. Nicole answered the door, defendant asked for a drink of water, which Nicole gave him, he stumbled, and she "caught" him. Defendant told her he needed to talk to her mother when she came home, then went back to his trailer. About a half-hour later, he saw a man running in Carnahan's backyard and gave chase unsuccessfully; at that point, Carnahan came home.

When investigator Lorenzano joined the interview, the questioning went over much the same ground again, with defendant giving more detail about the "Mexican" man he had seen in Carnahan's backyard. The detectives asked about events after Carnahan returned and before the first officers arrived, including a fall defendant took in which he claimed he sustained a visible injury to his elbow.

Eventually, Hanson asked defendant about his drug use and any past arrests. Defendant admitted some arrests and related, as he had to Deputy

Shapiro, the circumstances of his 1983 shooting injury during an attempted commercial burglary. Hanson asked, "Now, how do I know that—that you didn't burglarize this house next door?" Defendant said his disability physically prevented him from doing so, and when Hanson asked directly, "Did you burglarize the house?" defendant denied it. The detectives then suggested he might have needed money for heroin and asked if he had any money. Hanson urged him to tell them the truth, to which defendant replied he was doing so and he would never burglarize a person's house.

After some discussion of Carnahan's personal life, defendant's relationship with her (defendant said they had had a talk about a week earlier about "boyfriends and girlfriends"), and defendant's encounter with a man in Carnahan's backyard, Hanson asked a series of questions suggesting defendant might have been in the Carnahan house that day and might know what happened to Nicole. On defendant's denial, Hanson seemed to back off, but soon began questioning defendant about any weapon he might have had with him when he went to the Carnahan house; defendant admitted having a "stout stick" that he always carried.

Hanson told defendant Nicole had been killed and that "this is the time for you to be honest with me." When defendant denied knowing anything about Nicole's death, the detectives asked him about the knife he was wearing when he saw Dennis Sullivan that afternoon. Defendant said he left it at his trailer after that; Hanson asked for permission to search the trailer, but defendant said he would get it for them instead. When Lorenzano suggested defendant must still have had the knife at Carnahan's, defendant said, "You guys are trying to trick me, you know." The following colloquy ensued:

"Hanson: We just want to make sure that you didn't break into that house.

"[Defendant]: I didn't break into it.

"Hanson: Okay. And then while you were in the house maybe, uh, maybe Nikki surprised you and because you carried that knife with you—You were seen earlier. You didn't want to get caught, so, you hurt Nikki. And maybe in the process of hurting Nikki, you didn't mean to hurt her as bad as you did.

"[Defendant]: Huh-uh.

"Hanson: And, uh, and—

"[Defendant]: Am I under arrest?

"Hanson: No, you're not under arrest.

"[Defendant]: I'd like to . . . (Tape Inaudible) . . . Can I get a ride home please? I've told you everything I know.

"Hanson: Right.

"[Defendant]: I've told you the best I can, and you—you're trying to twist words. I'm being honest with you.

"Hanson: Well, you can see where we're—we're, you know, we're a little suspicious, you know—

"[Defendant]: Yeah.

"Hanson: Because of, um, uh, you were seen with that knife."

Hanson again suggested defendant might have sought money for his addiction and perhaps "didn't mean to harm anybody." Defendant said he was physically incapable of attacking anyone; the detectives questioned how, then, he could have pursued the "Mexican guy" in Carnahan's backyard. Defendant accused the detectives of trying to trick him, which they denied. The conversation continued as follows:

"[Defendant]: Yeah, you guys are. Man I—Can I get a ride home please? Can I please get a ride home? You going to charge me or what, you know? I got my rights. I'm not on pro—I'm not on probation.

"Hanson: Right.

"[Defendant]: I told you everything I know, you know.

"Hanson: Right.

"[Defendant]: I'll give you my doctor—I'll give you my doctor's . . . address and name. You can call up him, and he'll tell you how messed up I am, you know. [¶] . . . [¶]

"Hanson: You're the last one to see Nikki, you know, uh— [¶] . . . [¶]

"[Defendant]: How do you know that? Because I volunteered and told you that, right? [¶] . . . [¶]

"Hanson: Uh-hum.

"[Defendant]: Yeah, not because you guys tricked me into say [*sic*] it. You guys going to give me a ride home, or am I going to have to walk home like I always do when I come down here to—to—be honest with you. . . . (Tape Inaudible).

"Hanson: Well—well, what I'm going to have—to ask you to do, Ron—

"[Defendant]: Yeah.

"Hanson: Have a seat here."

Hanson then asked defendant "to voluntarily give us your clothes" to be checked for trace evidence. In exchange defendant would get a jumpsuit to wear home. Defendant agreed. While they waited for the lab technician to come, the detectives continued to question defendant, who continued to deny involvement. Defendant at one point asked who was going to take him home, to which Hanson replied, "We will as soon as we grab your clothes." Lorenzano asked defendant whether anyone else had been at his trailer that day. Defendant said his girlfriend had not been there because they had had "a little fight." In answer to further questions, he explained that the knife he had been carrying was one of a set of seven kitchen knives his mother owned. The lab technician then took defendant's clothes and photographed his body, with special attention to scratches and bruises the detectives pointed out (and which defendant said were from falls or needle use).

Hanson again asked defendant if he had been in the Carnahan house or was involved in Nicole's death, and defendant denied both. He asked defendant to take a seat and assured him he would be "out of here . . . [a]s soon as I get this patrol guy to take you back again." Hanson then asked a few questions about defendant's family, clothing (defendant said he had changed from a sweatshirt to a jacket earlier), and drug and alcohol use that day (defendant said he had had a couple of beers but no heroin or methadone). Hanson said he would either give defendant a ride back or "get this, uh, patrolman" to do so.

After a few more questions about defendant's visit that day with Dennis Sullivan, Lorenzano called Hanson out of the room. Hanson testified that Lorenzano conveyed to him information gathered at the crime scene that linked defendant to the crime, including that property from the Carnahan residence had been found on defendant's property. On returning to the interview room, Hanson asked if they could have a technician come in and swab defendant's hands. Defendant said he wanted to "go home right now" and, when asked if he would stay voluntarily a little longer to talk to other officers, he refused.

Hanson then told defendant he could not go home, and read defendant the *Miranda* advisements. Defendant said he would talk to the other officers when they arrived. After the lab technician took some hair samples, Hanson and Lorenzano engaged defendant in another round of accusatory questioning. Defendant barely responded to the questions, continuing to deny any involvement. Eventually he said, "I want to talk to a lawyer." Hanson said, "That's the magic word" and stopped questioning defendant.

We agree with the trial court that the sheriff's station interview did not, in its entirety, constitute custodial interrogation. As already discussed, defendant, the last person known to have seen the victim and obviously an important witness, was asked—and freely agreed—to come to the station to give a statement. In context, Hanson's statement that "we have to do [it] now" rather than the next day clearly referred only to the importance of getting information promptly and did not convey a command that defendant go to the station. On arriving at the station, defendant asked whether, and was again assured, he was there only to give a statement. Once in the interview room at the station, Hanson expressly told defendant he was not under arrest and was free to leave. Defendant said he understood. Defendant was not handcuffed or otherwise restrained, and there was no evidence the interview room door was locked against his leaving. The interview was fairly long—one hour 45 minutes—but not, as a whole, particularly intense or confrontational. The interview focused, initially, on defendant's encounter with Nicole, the missing fence boards, and information defendant might have had about the man he reported seeing in Carnahan's backyard or others connected with Carnahan. For a substantial period, while defendant filled in his previous statements with details, the questioning did not convey any suspicion of defendant or skepticism about his statements.

After a while, to be sure, the detectives interjected some more accusatory and skeptical questions, with Hanson asking defendant straight out, "Did you burglarize the house?" and, later, urging him to begin being "honest with me." The detectives' questions about defendant's prior arrests, drug use, need for money, and carrying of a knife and other weapons on the day of the crimes conveyed their suspicion of defendant's possible involvement. But *Miranda* warnings are not required "simply because the questioning takes place in the station house, *or because the questioned person is one whom the police suspect.*" (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 97 S.Ct. 711], italics added.) While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody. (See *id.* at pp. 493–495 [no custody where defendant agreed to interview at police station, was told in interview that the police suspected him of a burglary and told (falsely) his fingerprints had been found at the scene,

but was allowed to leave at conclusion of interview].) At least until defendant first asked to be taken home and his request was not granted, a reasonable person in defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so.

*People v. Boyer, supra*, 48 Cal.3d 247, on which defendant relies, is readily distinguishable. The defendant there was a suspect when he was first contacted, and he was stopped by the police as he left his house by the back door, other officers having sought entry at the front door. (*Id.* at p. 263.) Although the defendant was asked, and agreed, to "voluntarily" go to the police station for an interview, once at the station he was given *Miranda* advisements, directly accused of having committed the homicide under investigation, and repeatedly told that the police had evidence of his guilt of which he was unaware and that he would not be able to live with his guilt unless he confessed. (*Boyer*, at pp. 264–265.) Several times the defendant asked whether he was under arrest and said he wanted a lawyer and did not wish to speak further, but the police interrogator ignored these remarks and continued questioning him. (*Id.* at p. 265.) We held this set of circumstances—the manner in which the police "accosted" the defendant at his home (*id.* at p. 268), their administration of *Miranda* advisements at the interrogation's outset, the defendant's being subject to "more than an hour of directly accusatory questioning" (*Boyer*, at p. 268) in which he was falsely told the police had the evidence to prove his guilt, and the officers' response to the defendant's questions about arrest—showed he had in fact been arrested, making his interrogation custodial for *Miranda* purposes (*Boyer*, at p. 272).

Defendant, in contrast, was first contacted as a witness with potentially important information about the burglary of his neighbor's house, and the possible abduction of a child, rather than as a homicide suspect. (When Deputy Robinson first contacted defendant at his trailer and interviewed him in the patrol car, Nicole's body had not yet been found.) From the time defendant was asked to come to the sheriff's station through the first portion of the interview, the police consistently conveyed to defendant that they wanted to question him only as a witness; defendant sought and received the assurance that he was being asked only to give a statement of what he had seen and heard that day. Even when the interviewers began to express some skepticism about defendant's statements, they did not claim to know he was guilty or, until the point investigator Hanson expressly arrested him, to have evidence of his guilt. Unlike the defendant in *Boyer*, moreover, defendant was not detained while trying to leave his house, nor did the police repeatedly ignore statements that he wanted a lawyer and did not want to talk to them further.

*People v. Aguilera* (1996) 51 Cal.App.4th 1151 [59 Cal.Rptr.2d 587] is similarly distinguishable on its facts. There police, on information of the defendant's involvement in a gang-related homicide, went to his house and asked him and his mother if the defendant would talk to them at the station about the killing and for consent to search the house for evidence of homicide and gang involvement. (*Id.* at p. 1159.) At the station, police conducted an interrogation the appellate court described as "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating." (*Id.* at p. 1165.) The officers repeatedly told the defendant they had evidence of his involvement and that the interview would end only when he told them the "truth," conveying, in context, the message that the defendant would be interrogated until he admitted his involvement in the crime. (*Id.* at pp. 1163–1164.) Without belaboring the point, none of these circumstances were present in the case at bench.[5]

We need not decide whether the interview became custodial when defendant asked to end the interview and go home, but was not given the transportation he had been promised. Defendant made no statements of any significance after that point, largely repeating his earlier responses. Defendant argues admission of the interview was prejudicial because the prosecution used his exculpatory statements made during the interview to rebut his claim of an impaired mental state, but he points to no such statements that he first made after he sought to end the interview and be driven home. Any error in not suppressing the last part of the taped sheriff's station interview would, therefore, be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

## II. *Admission of Expert Opinion Regarding Bloodstain in the Living Room*

■ Defendant contends the trial court prejudicially erred by allowing a criminalist to testify that if a bloodstain found on the Carnahans' living room carpet was deposited by a person, the person must have been lying down rather than standing up. We agree the prosecutor's hypothetical question was improper, as there was no evidence the stain was deposited from a person

---

[5] Defendant also cites *U.S. v. Lee* (9th Cir. 1982) 699 F.2d 466. There the appellate court, reviewing under a *deferential* standard the trial court's implied finding the defendant was in custody, in a police car, at the time he confessed, affirmed the district court's ruling suppressing the confession. (*Id.* at p. 468.) While there may have been a "reasonable view of the evidence" (*ibid.*) supporting the custody finding in *Lee*, the decision is not persuasive under the standard of review we apply here; as explained earlier, we must determine *independently* whether a reasonable person in defendant's circumstances would have believed himself free to end the interview and leave. (*People v. Leonard, supra,* 40 Cal.4th at p. 1400.) Here the trial court found defendant was *not* in custody, and we reach the same conclusion on our independent evaluation of the circumstances surrounding the sheriff's station interview.

rather than an object that had been in contact with a person, but do not agree admission of the evidence was prejudicial.

During the prosecution's case, criminalist Gene Avilez described a small bloodstain on the living room carpet, the only bloodstain found in that room. (Nicole's body was found in her bedroom, where there were numerous bloodstains on objects in various parts of the room.) Over defense objections of lack of foundation and of prejudicial effect outweighing probative value (Evid. Code, § 352), Avilez was permitted to answer this hypothetical question from the prosecutor: "If you assume that that bloodstain was deposited by a human being, do you have an opinion as to whether or not the individual would have been standing or either lying down or very close to the carpet at the time that bloodstain was deposited?" The witness opined the person "was either at or near the surface of the carpeting" at the time. But on cross-examination by the defense, as in the hearing on admissibility, Avilez testified he could not determine whether the stain had been deposited from a person or from an object.

■ This court recently summarized the relevant limits on hypothetical questions to expert witnesses. " 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]' [Citation.] It is true that 'it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question.' [Citation.] On the other hand, the expert's opinion may not be based *'on assumptions of fact without evidentiary support* [citation], *or on speculative or conjectural factors* . . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1008 [77 Cal.Rptr.3d 163, 183 P.3d 1146], italics added.)

The record contains no evidence the living room bloodstain was deposited directly from Nicole's wounds, rather than from, for example, a weapon used to attack her. Avilez could not answer how it was deposited, and the Attorney General points to nothing beyond his testimony to support the hypothetical question's assumption. For that reason, the premise of the prosecutor's hypothetical question was not rooted in the facts shown by the evidence; rather, it was an " 'assumption[] of fact without evidentiary support.' " (*People v. Richardson, supra*, 43 Cal.4th at p. 1008.) The hypothetical question thus called for an opinion without adequate foundation.

As the concurring and dissenting opinion points out, trial courts enjoy a measure of latitude in determining the permissible scope of expert testimony; a ruling on admissibility of such evidence under Evidence Code section 352 is reviewed under an abuse of discretion standard. (*People v. Richardson, supra*, 43 Cal.4th at p. 1008.) But when the proposed expert testimony rests on an assumption without any support in the trial evidence, the court does abuse its discretion in admitting it. Such testimony has little or no probative value, bears the potential to mislead the jury into accepting the unsupported assumption and drawing from it unwarranted conclusions, and thus cannot significantly "help the trier of fact evaluate the issues it must decide." (Conc. & dis. opn., *post*, at p. 419.)

The concurring and dissenting opinion argues the disputed question's assumption, that Nicole directly deposited the bloodstain in the living room, can be deduced from the fact Nicole "could have been" in the living room at some point during the attack. (Conc. & dis. opn., *post*, at p. 419.) That an event *could* have happened, however, does not by itself support a deduction or inference it did happen. From the existence of a single small bloodstain in Nicole's living room one might speculate she was attacked in that room, but one might equally well speculate the blood dripped from defendant or his weapon as he left after murdering her in her bedroom. Jurors should not be invited to build narrative theories of a capital crime on speculation.

Defendant contends admission of this evidence was prejudicial because it allowed the prosecutor to suggest, in guilt phase argument, that defendant had first encountered Nicole in the living room, knocked her down, and then, after a pause, pursued the attack in her bedroom. The prosecutor thus "conjure[d] a vivid and unsettling image of Nicole lying on the floor in a pool of blood and ma[d]e it into the turning point of the crime."

In light of all the evidence and instructions, we do not agree the error was prejudicial. From defense counsel's cross-examination, the jury knew that the living room bloodstain might as likely have been deposited from an object as from Nicole, making it arguably insignificant. Indeed, the jury was instructed it was for them to determine whether the facts assumed in a hypothetical question had been proved and that they could consider any failure of such proof in evaluating the value and weight of the expert's opinion.

More important, the evidence of Nicole's numerous wounds and the blood prolifically deposited in her bedroom, independent of the small bloodstain in the living room, told the story of an extraordinarily brutal attack. Even without consideration of the living room bloodstain, the jury would have learned defendant, an adult man, repeatedly beat the 11-year-old victim on the head and face with one or more blunt objects and cut her neck with a knife,

leaving the broken blade in the wound, so that he could steal from her and her mother. The blood deposited throughout Nicole's bedroom, the force with which the most serious wounds were inflicted, the defensive wounds on Nicole's hands and wrists, and the fact defendant at some point in the attack must have switched weapons all pointed to a determined, cruel and extended assault on a weaker, unarmed victim. In light of that evidence, that the jury would have reached a different verdict in the guilt phase absent the erroneous admission of Avilez's answer about the living room bloodstain is not reasonably probable. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Nor is it reasonably possible the jury's penalty choice turned on this relatively minor aspect of the evidence. (*People v. Ashmus* (1991) 54 Cal.3d 932, 983–984 [2 Cal.Rptr.2d 112, 820 P.2d 214].)[6]

### III. *Sufficiency of Evidence to Prove Burglary and Robbery*

Defendant contends the evidence was constitutionally insufficient to show he formed the intent to take property from the Carnahans before entering their house, as required to prove burglary, or before attacking and killing Nicole, as required to prove robbery. He argues on this ground that the convictions for those felonies as well as the first degree murder conviction and the felony-murder special-circumstance findings must be reversed.

Observing that he could have gone to Carnahan's house earlier, when no one was home, and that he seemingly failed to plan thoroughly what items he would take from the Carnahans and how he would transport the items to his property, defendant argues "it is just as likely that [Nicole's killing] was the result of a spontaneous explosion of violence, with any theft as an afterthought, rather than [defendant's] entering the Carnahan house with the intent to steal."

We disagree. While no direct evidence indicated defendant formed the intent to steal before going to Carnahan's house, the circumstantial evidence

---

[6] Defendant also contends the admission of what he argues was highly prejudicial evidence violated the Eighth and Fourteenth Amendments to the United States Constitution. Acknowledging he did not object on this ground below, defendant argues his Evidence Code section 352 objection was sufficient to preserve the constitutional issues under the analysis of *People v. Partida* (2005) 37 Cal.4th 428 [35 Cal.Rptr.3d 644, 122 P.3d 765]. He is correct. As in *Partida*, defendant argues the trial court erred in overruling his Evidence Code section 352 objection and the error was so serious as to violate due process. (*Partida*, at pp. 436–438.) The Eighth Amendment argument merely adduces another consequence, unreliability of the verdicts, to the error. We do not, however, discern a constitutional violation in allowing the criminalist to give an answer that—as defense counsel showed on cross-examination—was insignificant because it was based on an unproven hypothesis. Any constitutional error would, moreover, be harmless beyond a reasonable doubt (*Chapman v. California, supra*, 386 U.S. at p. 24) for reasons explained in the text.

was more than sufficient. From the prosecution evidence, the jury could reasonably infer that defendant, a heroin addict without the money to pay his electricity bill, prearranged a passage to and from his neighbor's backyard by removing the fence boards, armed himself with a knife and metal pipe, and donned gloves before going to Carnahan's house. He then used the weapons he had brought to attack Nicole, ransacked the Carnahan home, taking numerous items large and small, and began moving that property through the fence opening he had made, a process Carnahan interrupted when she came home. The evidence suggested no motive, spontaneous or otherwise, for defendant to attack and kill Nicole, other than to facilitate his theft. That defendant might have planned the burglary better did not negate or even vitiate the force of the inferences the jury could reasonably draw; poor planning was not inconsistent with what the guilt phase jury knew of defendant's mental state and lifestyle.

Having "review[ed] the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]), we conclude a rational jury could find, beyond a reasonable doubt, that defendant entered the house with the pre-formed intent of taking property from the Carnahans and attacked Nicole to facilitate that plan. Substantial evidence thus supports the burglary and robbery convictions and the felony-murder theory of first degree murder. Substantial evidence also supports the finding, required for proof of the felony-murder special-circumstance allegations, that defendant had an independent felonious purpose for the burglary and robbery, that is, the theft was not merely incidental to his murder of Nicole. (*People v. Tafoya* (2007) 42 Cal.4th 147, 171 [64 Cal.Rptr.3d 163, 164 P.3d 590].) Finally, the evidence supporting the murder conviction and special circumstance findings was not so equivocal or unreliable as to render the death penalty violative of defendant's Eighth Amendment rights.

### IV. *Failure to Instruct on Theft as a Lesser Offense*

Defendant contends he was denied his federal and state constitutional rights to due process, a jury trial, and reliable guilt and death penalty verdicts by the trial court's failure to instruct the jury, sua sponte, on theft as a lesser included offense of robbery. He relies on the same theory of after-formed intent to steal as in his previous claim attacking the robbery and burglary convictions.

Instruction on a lesser included offense is required only when the record contains substantial evidence of the lesser offense, that is, evidence

from which the jury could reasonably doubt whether one or more of the charged offense's elements was proven, but could find all the elements of the included offense proven beyond a reasonable doubt. (*People v. Hughes* (2002) 27 Cal.4th 287, 365 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

As explained in the previous part, no evidence supports the theory of after-formed intent to steal. Defendant points to nothing in the record suggesting any motive for him to attack and kill Nicole other than to facilitate the theft. Mere speculation that he might have killed out of some other, spontaneous and violent impulse is not sufficient to warrant the instruction. (*People v. Zamudio* (2008) 43 Cal.4th 327, 361 [75 Cal.Rptr.3d 289, 181 P.3d 105].) In the absence of substantial evidence from which the jury could have found defendant guilty of theft as a lesser included offense to robbery, no such instruction was warranted.

## V. *Instructions on Deciding Degree of Murder and Between Murder and Manslaughter*

The jury was instructed on first degree murder (on theories of felony murder and premeditation), second degree murder (with malice aforethought but without premeditation) and on involuntary manslaughter (where malice is lacking due to intoxication). The jurors were further instructed that if they found defendant guilty of murder they must determine the degree. The court continued, using the current version of CALJIC No. 8.71 (6th ed. 1996): "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, *but you unanimously agree* that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." (Italics added.)

With regard to the lesser included offense of manslaughter, the court, using the current version of CALJIC No. 8.72 (6th ed. 1996), instructed: "If you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, *but you unanimously agree* that you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder." (Italics added.)[7]

---

[7] Prior to revision in 1996, neither instruction required unanimity on reasonable doubt as to the greater offense in order for a juror to give the defendant the benefit of such a reasonable doubt. CALJIC No. 8.71 (5th ed. 1988) stated: "If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, *but you have a reasonable doubt* whether such murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second

Defendant contends these instructions, in their above italicized parts, violated his constitutional due process and jury trial rights by suggesting to jurors that they must return a verdict on the greater offense unless they *unanimously* doubted whether it had been proven. As defendant puts it, "a juror who believed that [defendant] was guilty of some offense, but not necessarily first degree murder, would also believe that first degree murder must apply in the face of any disagreement. In other words, first degree murder became the default verdict."

The Attorney General first argues that any error in giving these instructions was invited because defense counsel included both on his list of requested instructions. However, "[t]he invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction." (*People v. Moon* (2005) 37 Cal.4th 1, 28 [32 Cal.Rptr.3d 894, 117 P.3d 591].) Here, no such tactical reason appears in the record. CALJIC Nos. 8.71 and 8.72 were the commonly used pattern instructions on application of the reasonable doubt principle to lesser included homicide offenses, a topic on which counsel obviously and appropriately wanted the jury to be instructed. Trial counsel's failure to detect in the standard instructions the flaw appellate counsel perceives and to request a modification does not demonstrate a tactical intent to induce the error now claimed.

On the merits, the Attorney General correctly notes that in *People v. Frye* (1998) 18 Cal.4th 894, 963–964 [77 Cal.Rptr.2d 25, 959 P.2d 183], we rejected a similar challenge to earlier versions of CALJIC Nos. 8.71 and 8.72. These earlier versions, however, did not contain the problematic language of which defendant now complains. (See fn. 7, *ante*.) We have not previously decided whether the particular instructions at issue here are reasonably likely to be understood and applied in an unconstitutional manner. (See *Frye*, at p. 957.)

In two decisions, the Third District Court of Appeal has rejected challenges, made on the same ground offered here, to the 1996 version of CALJIC Nos. 8.71 and 8.72, concluding in both cases that the challenged instructions, read together with the other instructions given, would not likely have led jurors to believe they were required to vote for first degree murder if any of the other jurors found that charge proven. (*People v. Gunder* (2007) 151 Cal.App.4th 412, 424–425 [59 Cal.Rptr.3d 817]; *People v. Pescador* (2004) 119 Cal.App.4th 252, 255–258 [14 Cal.Rptr.3d 165].)

degree." (Italics added.) Similarly, CALJIC No. 8.72 (5th ed. 1988) stated: "If you are satisfied beyond a reasonable doubt that the killing was unlawful, *but you have a reasonable doubt* whether the crime is murder or manslaughter, you must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder." (Italics added.)

In *Gunder*, the court relied on the trial court's having instructed with CALJIC No. 17.40, a pattern instruction on the duty of individual jurors to decide the case for themselves, which tells the jurors, in part, that they are not to "decide any question in a particular way because a majority of the jurors, or any of them, favor that decision." In light of that instruction, the *Gunder* court concluded, "a reasonable juror will view the statement about unanimity [in CALJIC No. 8.71] in its proper context of the procedure for *returning verdicts*, as indeed elsewhere the jurors are told they cannot *return* any verdict absent unanimity and cannot *return* the lesser verdict of second degree murder until the jury unanimously agrees that the defendant is not guilty of first degree murder." (*People v. Gunder, supra*, 151 Cal.App.4th at p. 425.) CALJIC No. 17.40 was also given in the present case, as was CALJIC No. 8.75, the instruction on returning verdicts to which the *Gunder* court referred, in which the jury is told not to return a verdict for second degree murder unless the jurors unanimously acquit of first degree murder, and not to return a verdict of manslaughter unless they unanimously acquit of murder.

In *Pescador*, the court relied, in addition to CALJIC No. 17.40, on two other instructions given: CALJIC No. 17.11, which told jurors, without any requirement of unanimity, that if they had reasonable doubts as to the degree of murder proven, they had to find the defendant guilty only of second degree murder (*People v. Pescador, supra*, 119 Cal.App.4th at p. 257); and CALJIC No. 8.50, which, as given, stated in part: " 'To establish that a killing is murder and not manslaughter, *the burden is on the People to prove beyond a reasonable doubt each of the elements of murder . . .*' " (*Pescador*, at p. 258). Neither CALJIC No. 17.11 nor CALJIC No. 8.50 was given in the present case, though the jury was, of course, instructed on the requirement of proof beyond a reasonable doubt (CALJIC No. 2.90) and its application to the mens rea elements of the charged crimes (CALJIC No. 4.21).

█ We conclude the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72, as the instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter. The references to unanimity in these instructions were presumably added to convey the principle that the jury as a whole may not return a verdict for a lesser included offense unless it first reaches an acquittal on the charged greater offense. (See *People v. Kurtzman* (1988) 46 Cal.3d 322, 329–333 [250 Cal.Rptr. 244, 758 P.2d 572].) But inserting this language into CALJIC Nos. 8.71 and 8.72, which address the role of reasonable doubt in choosing between greater and lesser homicide offenses, was unnecessary, as CALJIC No. 8.75 fully explains that the jury must

unanimously agree to not guilty verdicts on the greater homicide offenses before the jury as a whole may return verdicts on the lesser.[8]

We need not decide here, however, whether *Gunder* was correct that the possibility of confusion is adequately dispelled by instruction with CALJIC No. 17.40 on the jurors' duty of individual decision. Any error in giving these instructions was harmless beyond a reasonable doubt (*Chapman v. California, supra,* 386 U.S. at p. 24) in light of the jury's true findings on the burglary-murder and robbery-murder special circumstances. Having found defendant killed Nicole Carnahan in the commission of robbery and burglary, the jury must also have found him guilty of first degree murder on those same felony-murder theories. The lesser offenses of second degree murder and manslaughter were not legally available verdicts if defendant killed Nicole in the commission of burglary and robbery, as the jury unanimously determined he had. (See § 189; *People v. Bramit* (2009) 46 Cal.4th 1221, 1238 [96 Cal.Rptr.3d 574, 210 P.3d 1171]; *People v. Dillon* (1983) 34 Cal.3d 441, 472 [194 Cal.Rptr. 390, 668 P.2d 697].) Any confusion generated by the challenged instructions, therefore, could not have affected the jury's verdicts.[9]

## VI. *Instruction on First Degree Felony Murder*

Because the information charged first degree murder in terms of malice aforethought and premeditation, defendant contends the trial court deprived him of due process by instructing the jury on first degree murder predicated on killing in the commission of robbery and burglary. He further contends the court erred in failing to instruct the jury on the need for unanimity on the type of first degree murder committed.

For reasons given in prior decisions, we disagree. "A pleading charging murder in these terms adequately notifies a defendant of the possibility of conviction of first degree murder on a felony-murder theory. (*People v. Gallego* (1990) 52 Cal.3d 115, 188 [276 Cal.Rptr. 679, 802 P.2d 169].) Defendant mistakenly relies on a statement in the plurality opinion in

---

[8] The Judicial Council-approved instructions on choosing between degrees of murder and between murder and manslaughter do not contain the same potentially confusing unanimity requirement as the 1996 revisions of CALJIC Nos. 8.71 and 8.72. (See CALCRIM No. 521 ["The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."]; CALCRIM Nos. 570, 571, 580 [addressing manslaughter as a lesser included offense to murder].)

[9] The instruction on consideration of the special circumstance allegations did not contain the same potentially confusing language as the challenged instructions. In CALJIC No. 8.80.1 (6th ed. 1996), the jury was told: "The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true."

*People v. Dillon*[, *supra*,] 34 Cal.3d 441 . . . that the 'two kinds of murder'—that is, felony murder and murder with express or implied malice—'are not the "same" crimes.' (*Id.* at p. 476, fn. 23 (plur. opn. of Mosk, J.).) As we have since explained, however, this means only that the two forms of murder have different elements even though there is but a single statutory offense of murder. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394–395 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Pride* (1992) 3 Cal.4th 195, 249 [10 Cal.Rptr.2d 636, 833 P.2d 643].) 'Felony murder and premeditated murder are not distinct crimes . . . .' (*People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].)" (*People v. Kipp, supra*, 26 Cal.4th at p. 1131; accord, *People v. Hughes, supra*, 27 Cal.4th at pp. 369–370.) Moreover, in the present case the information charged defendant, in addition to first degree murder, with the crimes of burglary and robbery, and alleged as special circumstances that defendant murdered Nicole Carnahan during the commission of burglary and robbery. These allegations gave defendant more than adequate notice the prosecution would pursue a felony-murder theory of first degree murder. (*People v. Morgan* (2007) 42 Cal.4th 593, 616–617 [67 Cal.Rptr.3d 753, 170 P.3d 129]; *Kipp*, at p. 1131.)

■ As to the asserted requirement for unanimity, it has long been settled "that unanimity as to the theory under which a killing is deemed culpable is not compelled as a matter of state or federal law. Each juror need only have found defendant guilty beyond a reasonable doubt of the single offense of first degree murder as defined by statute and charged in the information. (*Schad* v. *Arizona* (1991) 501 U.S. 624, 630–645 [115 L.Ed.2d 555, 111 S.Ct. 2491, 2496–2504] (plur. opn. of Souter, J.); *id.* at pp. 648–652 [111 S.Ct. at pp. 2505–2507] (conc. opn. of Scalia, J.); *People v. Pride, supra*, 3 Cal.4th 195, 249–250, and cases cited; *People v. Chavez* (1951) 37 Cal.2d 656, 670–672 [234 P.2d 632].)" (*People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

Defendant argues our prior holdings cannot stand in light of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and its progeny. This line of authority, however, addresses the Sixth Amendment right to a jury determination of facts used in sentencing beyond the elements of the charged offenses. Defendant cites nothing in the United States Supreme Court's decisions creating new notice or unanimity requirements for alternative *theories* of a substantive offense such as first degree murder. (See *People v. Taylor* (2010) 48 Cal.4th 574, 626 [108 Cal.Rptr.3d 87, 229 P.3d 12]; *People v. Morgan, supra*, 42 Cal.4th at p. 617.)

VII. *Instruction on Consciousness of Guilt*

■ Defendant contends a standard instruction outlining the permissible inference of consciousness of guilt that may be drawn from a defendant's

willfully false statements (CALJIC No. 2.03)[10] was "unfairly partisan and argumentative" and allowed the jury to make irrational inferences about his state of mind in commission of the offenses. As in many other recent decisions, we reject defendant's claim that instruction on an inference of consciousness of guilt deprived him of due process or other rights under the United States and California Constitutions. (See, e.g., *People v. Richardson, supra,* 43 Cal.4th at p. 1019; *People v. Howard* (2008) 42 Cal.4th 1000, 1025 [71 Cal.Rptr.3d 264, 175 P.3d 13]; *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Kelly* (1992) 1 Cal.4th 495, 531–532 [3 Cal.Rptr.2d 677, 822 P.2d 385] [noting that the instruction's admonition that evidence of false statements is insufficient by itself to prove guilt favors the defense but cannot sensibly be given without the complementary portion allowing the jury to consider the evidence].)

Defendant repeatedly told Carnahan and the police he had seen a "Mexican" man (in the original telling, two men) in Carnahan's backyard. He eventually went so far as to detail the man's clothing, hairstyle and movements. As in *People v. Howard, supra,* 42 Cal.4th at page 1025, defendant's jury "could quite reasonably conclude that defendant made a series of false statements to deflect suspicion from himself." And while defendant may be correct that one could not rationally infer the existence of the exact mens rea required for each charged crime from his apparent falsehoods, the challenged instruction, read as a whole, did not suggest such an inference be made. "The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*People v. Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423].)

### VIII.  *Instructions on Evaluation of Evidence*

Defendant contends a number of standard instructions guiding the jury's evaluation of evidence (CALJIC Nos. 2.01, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 8.83) undermined the requirement of proof beyond a reasonable doubt, depriving him of his constitutional rights to due process, a jury trial, and reliable determination of the special circumstances and capital sentence. We

---

[10] CALJIC No. 2.03 states: "If you find that before this trial a defendant made a willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

recently explained why the challenged instructions were not reasonably likely to have such an effect. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1058–1059 [71 Cal.Rptr.3d 675, 175 P.3d 632]; see also *People v. Rundle* (2008) 43 Cal.4th 76, 154–155 [74 Cal.Rptr.3d 454, 180 P.3d 224]; *People v. Nakahara, supra,* 30 Cal.4th at pp. 713–714.) Defendant makes no compelling argument for revisiting those conclusions.

## IX. *Constitutionality of California's Death Penalty Law*

Acknowledging the same arguments have been raised and rejected in previous decisions, defendant, to preserve his claims, contends several features of California's capital sentencing scheme violate provisions of the United States Constitution. For the reasons given in our precedents, we again reject these claims.

The set of special circumstances qualifying a first degree murder for capital sentencing (§ 190.2) is not impermissibly broad. (*People v. Dykes* (2009) 46 Cal.4th 731, 813 [95 Cal.Rptr.3d 78, 209 P.3d 1].) Nor is section 190.3, factor (a), under which the jury may consider the "circumstances of the crime" as a factor in aggravation (or mitigation) of penalty, so broad as to make imposition of a death sentence arbitrary and capricious. (*People v. Brasure, supra,* 42 Cal.4th at p. 1066.) " 'As in [*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244]], defendant argues that a seemingly inconsistent range of circumstances can be collected from decisions upholding imposition of the death penalty. As we observed in *Brown,* however, "[w]hat this reflects is that each case is judged on its facts, each defendant on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances." (*Brown, supra,* at p. 401.)' " (*Brasure,* at p. 1066.)

" 'Our statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." [Citation.] No instruction on burden of proof is required in a California penalty trial because the assessment of aggravating and mitigating circumstances required of penalty jurors is inherently " 'normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." ' (*People v. Bell* (2007) 40 Cal.4th 582, 620 [54 Cal.Rptr. 3d 453, 151 P.3d 292].) Nor is an instruction on the *absence* of a burden of proof constitutionally required. (*People v. Cornwell* (2005) 37 Cal.4th 50, 104 [33 Cal.Rptr. 3d 1, 117 P.3d 622].)" (*People v. Brasure, supra,* 42 Cal.4th at p. 1067.) The United States Supreme Court's decisions in

*Apprendi v. New Jersey, supra*, 530 U.S. 466, and its progeny do not establish a Sixth Amendment right to determination of particular aggravating factors, or the balance of aggravation and mitigation beyond a reasonable doubt, or by a unanimous jury. (*People v. Taylor* (2009) 47 Cal.4th 850, 899 [102 Cal.Rptr.3d 852, 220 P.3d 872]; *Brasure*, at pp. 1067–1068.) Finally, "[n]o instruction on a presumption that the sentence should be life without parole, rather than death, was constitutionally required." (*Taylor*, at p. 899.)

"The Constitution does not forbid use of unadjudicated prior criminal activity as a circumstance in aggravation or require jury unanimity as to proof of such prior activity. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1181–1182 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Stanley* (2006) 39 Cal.4th 913, 962 [47 Cal.Rptr.3d 420, 140 P.3d 736].)" (*People v. Brasure, supra*, 42 Cal.4th at p. 1068.)

"The use of the limiting adjectives 'extreme' and 'substantial' in the instruction on section 190.3, factors (d) [(referring to 'extreme mental or emotional disturbance')] and (g) [(referring to 'extreme duress' and 'substantial domination' by another)] does not unconstitutionally prevent the jury from considering mitigating evidence." (*People v. Taylor, supra*, 47 Cal.4th at p. 899.) As defendant acknowledges, we have rejected this contention because jurors remain free to weigh lesser mental disturbance, duress, or domination under the "catchall" provision of section 190.3, factor (k), which permits consideration of "[a]ny other circumstance which extenuates the gravity of the crime." (See, e.g., *People v. Wright* (1990) 52 Cal.3d 367, 443–444 [276 Cal.Rptr. 731, 802 P.2d 221].) Defendant urges us to reconsider these holdings, observing that in his case the prosecutor argued to the jury his mental impairments were not severe enough to qualify as "extreme" disturbance under factor (d), and did not address any lesser mental disturbance in discussing factor (k).[11] Nothing in the prosecutor's argument or the court's instructions, however, precluded the jury from considering the evidence of defendant's mental impairments, whether under factor (d) (to the extent jurors disagreed with the prosecutor's assessment of the impairments as less than extreme), section 190.3, factor (h) (referring to "mental disease or defect" as potentially impairing defendant's ability to appreciate the criminality of his conduct or conform it to the law's requirements) or the catchall factor (k). Defense counsel argued to the jury that defendant's conduct during the crime showed he acted in the grip of a mental disturbance. No objection was heard to this argument, and while counsel did not explicitly tie it to any of the listed mitigating factors, he was in no manner precluded from doing so. As defendant was neither prevented from introducing evidence of mental impairment, nor precluded from arguing its relevance and force as mitigation, or

---

[11] The trial court made a similar finding in denying the automatic motion for modification of sentence.

from having it considered as such, we see no infringement on defendant's rights under the Fifth, Sixth, Eighth or Fourteenth Amendment to the United States Constitution.

The trial court did not err in failing to delete from its instructions references to assertedly inapplicable factors listed in section 190.3 or to specify which factors may be considered only in mitigation. (*People v. Taylor, supra*, 47 Cal.4th at p. 899; *People v. Brasure, supra*, 42 Cal.4th at p. 1069.)

Comparative intercase proportionality review of death sentences is not constitutionally required. (*People v. Taylor, supra*, 47 Cal.4th at p. 900; *People v. Brasure, supra*, 42 Cal.4th at p. 1068; *People v. Lawley* (2002) 27 Cal.4th 102, 169 [115 Cal.Rptr.2d 614, 38 P.3d 461].) "Because capital and noncapital defendants are not similarly situated in the pertinent respects, equal protection principles do not mandate that capital sentencing and sentence-review procedures parallel those used in noncapital sentencing." (*Brasure*, at p. 1069.)

## X. *International Law and the Eighth Amendment*

"California's use of capital punishment as an authorized sentence for certain specified types of first degree murder does not constitute cruel and unusual punishment merely because most nations have chosen not to employ the death penalty at all. (*People v. Brasure, supra*, 42 Cal.4th at pp. 1071–1072; *People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44 [45 Cal.Rptr. 3d 407, 137 P.3d 229].)" (*People v. Taylor, supra*, 47 Cal.4th at p. 900.)

Defendant further argues international law requires that when the death penalty *is* invoked, the state must rigorously observe guarantees of a fair trial. While we have concluded the trial court erred in permitting a forensic expert to answer a hypothetical question that lacked foundation in the evidence (see pt. II., *ante*) and have, for purposes of discussion, assumed error in failing to suppress the last portion of defendant's interview at the sheriff's station (see pt. I., *ante*) and in giving certain standard instructions on deciding between greater and lesser offenses (see pt. V., *ante*), none of these errors, actual or assumed, rendered defendant's trial unfair or affected the jury's verdict either separately or, as discussed below, cumulatively.

## XI. *Cumulative Prejudice from Errors*

The three errors we have concluded or assumed occurred below, each individually harmless, related to distinct procedural or evidentiary issues not

closely related to one another. We see no possibility their individual effects, if any, cumulatively resulted in prejudice to defendant.

### DISPOSITION

The judgment of the superior court is affirmed.

Baxter, J., Chin, J., Moreno, J., and George, J.,* concurred.

**KENNARD, Acting C. J.,** Concurring and Dissenting.—I concur in the majority's affirmance of the judgment of death. But I disagree with the majority's analysis of an issue pertaining to a hypothetical question asked by the prosecutor.

Defendant was charged with bludgeoning and stabbing to death his 11-year-old neighbor, Nicole Carnahan, while burglarizing her house when she was home alone. Police found the victim's body in her bedroom, which was stained heavily with blood. On the carpet in the living room was a single, small bloodstain.

That bloodstain became part of the prosecution's theory of the crime: that Nicole saw defendant in her house and, presumably, cried out; that he hit her, and she fell; and that, as she lay on the living room carpet bleeding (and leaving a stain), defendant had what the prosecutor described to the jury as an "opportunity to think." Calling that moment "the turning point" of the crime—at which defendant could have chosen to flee, but chose instead to kill Nicole and carry on with his burglary—the prosecutor used it to argue that the murder had been premeditated.

To support its theory, the prosecution called criminalist Greg Avilez, an expert on bloodstains, to testify about the lone stain in the living room. The prosecutor asked him whether the person who left the stain had likely been standing or lying down at the time. The defense objected, asserting that no evidence proved that the stain had come from a person bleeding on the carpet rather than from a bloody object that had been placed there—such as the brass rod or pipe that defendant had with him, and that was later found, stained with blood, in his toolshed. The trial court, reasoning that jurors could logically infer that the stain had come either from a person or from a bloody object, ruled that the prosecutor could base a hypothetical question on the first of those two inferences.

The prosecutor then asked criminalist Avilez whether, assuming that a person had "deposited" the bloodstain, the person "would have been standing

---

*Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

or either lying down or very close to the carpet." Avilez replied: "[a]t or near the surface of [the] carpeting."

The majority concludes, first, that the prosecutor's hypothetical question to the criminalist "called for an opinion without adequate foundation" and the trial court abused its discretion in allowing it, but, second, that the abuse of discretion was harmless. (Maj. opn., *ante*, at pp. 405–406.) On the first conclusion, I disagree. I conclude that the trial court did not abuse its discretion. Therefore, I do not reach the question of prejudice.

Decades ago, this court set forth principles governing hypothetical questions. In discussing the breadth of a trial court's discretion in applying those principles, this court noted that "[i]t is not essential . . . that the facts assumed should be undisputed." (*Guardianship of Jacobson* (1947) 30 Cal.2d 312, 324 [182 P.2d 537] (*Jacobson*).) Rather, hypothetical questions are proper as long as they are based on "facts within the possible or probable range of the evidence" and are "not unfair or misleading." (*Ibid.*) The trial court has "large discretion relating to the form of the question." (*Ibid.*)

Because a trial court hears all the evidence, that court is in the best position to decide if a hypothesis is within the "possible or probable range" of that evidence (*Jacobson, supra*, 30 Cal.2d at p. 324), and it therefore deserves a measure of latitude in doing so. The trial court can also best determine whether, ultimately, the testimony will help the trier of fact evaluate the issues it must decide. (*People v. Richardson* (2008) 43 Cal.4th 959, 1008 [77 Cal.Rptr.3d 163, 183 P.3d 1146].) Hence, this court reviews a trial court's rulings on hypothetical questions for abuse of discretion. (See, e.g., *id.* at p. 1009.)

Here, the trial court did not abuse its discretion in concluding that the hypothesized fact—that the bloodstain came directly from a person—was within the "possible . . . range" of the evidence. (*Jacobson, supra*, 30 Cal.2d at p. 324.) A hypothetical question can rest on " ' "any theory which can be deduced" from any evidence properly admitted at trial, including the assumption of "any facts within the limits of the evidence." ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 449 [127 Cal.Rptr.2d 544, 58 P.3d 391], italics omitted.) "[D]irect testimony is not required" to support a hypothesized fact as long as the fact "is fairly inferable from the circumstances proved." (1 McCormick on Evidence (6th ed. 2006) Requirement of Firsthand Knowledge, § 14, p. 89, fn. omitted.) The evidence here proved these circumstances: The wounds inflicted on the murder victim caused her to bleed, and hers was the blood on the carpet in the living room, an area where she could have been. From that evidence, a juror could reasonably deduce the factual theory assumed by the prosecutor's hypothetical question, namely, that the victim's blood was on the carpet because she bled there.

That the expert could not exclude the alternative possibility—that the bloodstain on the living room carpet came from a weapon used to attack the victim—is of no consequence. The inference must be *a* reasonable one, not the *only* reasonable one. For the same reason, it does not matter that no evidence pointed exclusively to the prosecutor's hypothesis. Yet that is what the majority seems to require.

Nevertheless, because I find no impropriety in the trial court's ruling at issue, I agree with the majority's affirmance of the judgment of death.

Corrigan, J., concurred.

Appellant's petition for a rehearing was denied March 16, 2011. Kennard, J., was of the opinion that the petition should be granted.