Filed 6/8/15  P. v. Lomeli CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL A. LOMELI,<br><br>        Defendant and Appellant. | B255968<br><br>(Los Angeles County<br>Super. Ct. No. KA100072) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jason Tran and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

In this appeal from multiple sex crime convictions, defendant Miguel A. Lomeli argues that the prosecutor's use of peremptory challenges based on a prospective juror's race was unconstitutional as explained in *Batson v. Kentucky* (1986) 476 U.S. 79, 97 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258, 276 (*Wheeler*).  He also argues that the court erred in limiting his expert witness's testimony by precluding his expert from answering hypothetical questions.  We find no error and affirm the judgment.

## FACTS AND PROCEDURE

In the spring of 2012, defendant moved in with his girlfriend and her three children— H., B., and J.  At the time defendant moved into their household, H. was six years old, and B. was eight years old.  Defendant sometimes babysat the children while their mother worked.  H. and B. testified that defendant sexually abused them.

### 1.  *H.*

H. first reported the abuse to her babysitter Nidia Gonzalez.  She told Gonzalez that defendant touched her on a daily basis.  Gonzalez asked H. to describe how and when defendant touched her.  H. responded that defendant licked her anus and vagina, put his penis in her hand, rubbed his penis on top of her vagina, and put his fingers inside her vagina and anus.

After reporting the abuse to Gonzalez, H. spoke to Officer Daniel Jauregui.  Officer Jauregui did not question her extensively and did not recall the specific questions he asked. H. told Officer Jauregui that defendant rubbed her and inserted his fingers in her vagina. Later, H. told Officer Martha Tate that defendant touched her and licked her private parts. H. also said that defendant touched her anus with his penis.

Nurse practitioner Toyetta Beukes examined H. and found that the condition of her genitalia neither confirmed nor denied the reported abuse.  According to Beukes, a person may be able to touch a child's vagina without reaching the hymen, and if that occurred no signs of the abuse would appear during an examination.  Nurse Beukes could not conclusively determine whether H. had been abused.

When interviewed by child advocate Susana Flores, H. reported defendant touched her many times.  He licked her and rubbed her with his penis.  Defendant removed her

2

underwear and touched her with his hand. Defendant inserted his penis in her vagina. Flores's videotaped interview of H. was played for the jurors. Flores testified that she was trained to ask open-ended questions to elicit a narrative.

At trial, H. initially had difficulty remembering what happened. She testified defendant did something she did not like, but testified that she did not remember defendant's specific conduct. She also did not remember other details. Eventually, H. testified that defendant touched her vagina with his penis. H. further testified defendant rubbed her, put his tongue in her vagina, and touched her skin with his penis. Defendant removed H.'s clothing and put his tongue and his penis in her vagina. Defendant also put his penis in her anus. H. testified defendant did not take her clothing off, but later testified inconsistently that he removed her pajama pants. H. testified that Officer Tate did not tell her what to say in court but did help her circle body parts on a diagram. H. later clarified that she circled the body parts where she had been touched.

## 2. B.

B. also told her babysitter that defendant touched her. When asked by a police officer, B. first said defendant never touched her and later said defendant touched her buttocks. B. testified at trial that defendant touched her buttocks. B. saw defendant ask H. to go into the bedroom but did not see what happened in the bedroom.

## 3. Defense

Defendant testified and denied any sexual contact with H. or B. Defendant insinuated that the children's babysitter fabricated the allegations because he confronted her when she removed food from the refrigerator.

Additional defense witnesses testified. Dr. Earl Fuller, a gynecologist, testified that H.'s hymen would have been damaged if defendant had inserted his finger or penis through the hymenal ring. Dr. Bradley Mcauliff, a psychology professor, testified that the accuracy of a child's story may be affected if the child is asked misleading questions, i.e., questions that suggest information about an event. He recommended using only open-ended questions when interviewing a child who claimed to be a victim of sexual abuse. Mcauliff did not interview H. or B., but watched a videotaped interview.

3

## *4. Verdict and Sentence*

Jurors convicted defendant of two counts of sexual intercourse or sodomy with a child under 10 in violation of Penal Code section 288.7, subdivision (a), two counts of oral copulation or sexual penetration with a child under 10 in violation section 288.7, subdivision (b). Jurors also convicted defendant of one count of a lewd act with a child in violation of Penal Code section 288, subdivision (a) and one count of attempted lewd act with a child. The court sentenced him to consecutive sentences totaling 50 years to life with the remaining sentences concurrent.

## DISCUSSION

## *1. Jury Selection*

Defendant argues his conviction must be reversed due to the prosecutor's exclusion of jurors based on their race. We first summarize the relevant legal principles and the relevant background. We then explain why defendant's argument lacks merit.

## *a. Legal Principles*

Our high court has thoroughly explained the relevant legal principles. "A prosecutor's use of peremptory challenges to excuse prospective jurors on the basis of group bias, including on grounds of race or ethnicity, violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.] Under *Batson, supra*, 476 U.S. 79, such practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citation.] [¶] 'In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'"'" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 101.)

4

"'A prosecutor asked to explain his conduct must provide a "'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." [Citation.] "The justification need not support a challenge for *cause*, and even a 'trivial' reason, if genuine and neutral, will suffice." [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.' [Citation.] '[B]ut race-based decisions are not constitutionally tolerable.' [Citations.] [¶] Therefore, '[a]t the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her.'" (*DeHoyos, supra*, 57 Cal.4th at p. 102.)

"'"'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.'"'" (*DeHoyos, supra*, 57 Cal.4th at p. 102.)

*b. Background*

Defense counsel's first *Wheeler* motion followed the prosecutor's excusal of Juror No. 5178. Defense counsel stated that this was the third male Hispanic juror that the prosecutor excused (a statement the court neither confirmed nor disputed). Juror No. 5178 was a security guard, who had trouble speaking English. During voir dire, he stated, "I have

a problems speaking English and understand." In response to defense counsel's *Wheeler* motion, the court stated that Juror No. 5178 raised the issue that he could not speak English and "wants to get off" the jury. The court found that a "reasonable litigator" could wonder whether he would "be able to understand all the nuances presented." The court found a nonracial basis for the exercise of a peremptory challenge and denied defense counsel's *Wheeler* motion. The court did not require the prosecutor to explain her reasons for excusing the juror.

Defense counsel's second *Wheeler* motion followed the prosecutor's use of a peremptory challenge to excuse Juror No. 7098. Counsel initially argued that the juror should not have been excused based on his gender, i.e., male. Later defense counsel stated, "He could be Hispanic. I'm not sure whether he is or not." Defense counsel subsequently concluded, ". . . I believe he may be Hispanic. I don't know."

During voir dire questioning, Juror No. 7098 indicated that it would be a general hardship for him to be on the jury, though he acknowledged he would not lose his house or his car. Juror No. 7098 worked in the film business, and his employment was contingent on finding projects. The court indicated that the fact Juror No. 7098 was paid only when he worked and he was short on money was a nonracial basis for excusing him. The court did not ask the prosecutor to explain her decision to excuse Juror No. 7098.

Defense counsel's third and final *Wheeler* motion preceded a challenge to Juror No. 2544. Juror No. 2544 did not read or write English. When the prosecutor asked if there was any reason any juror could not be fair and impartial, Juror No. 2544 responded, "This is a new experience for me, and I just now beginning to understand what it takes, and I find myself often pre-judging people. I don't know if that has any effect." He continued, "I pre-judge people based on appearance or the way they speak." He further explained: "[Y]ou see a person, and you automatically think you know what the person is about, and you know it's totally—I understand that I'm wrong when it comes to that."

The court asked the prosecutor to explain why she *may* choose to strike the juror. The prosecutor responded that his admission that he prejudged people could pose a problem. The court concluded that "[w]hat is important is whether or not it [the prosecutor's reason

for excusing the juror] is race related. And pre-judging is not by itself race related. So I'm going to find that she's got a race neutral justification. If she wants to kick him, that's fine."

c. *Analysis*

In his opening brief, defendant argues that with respect to each *Wheeler* motion, the trial court should have reached the third stage of the analysis to determine whether defense counsel showed purposeful discrimination. He argues that the failure to reach the third stage requires reversal. In his reply brief, defendant refined his argument, claiming that only the challenge to Juror No. 2544 required the trial court to evaluate the genuineness of the prosecutor's reasons and the court failed to comply with that requirement. We now turn to that question.

Although, the trial court did not use the word "genuine," it concluded: "What is important is whether or not it is race related. And pre-judging is not by itself race related. So I'm going to find that she's got a race neutral justification." By accepting the prosecutor's race neutral justification the court necessarily found that it was credible. The trial court was not required to use the word genuine in evaluating the prosecutor's rationale for excusing Juror No. 2544. The trial court's determination is entitled to deference on appeal, and we find no error. (*DeHoyos, supra*, 57 Cal.4th at p. 102.)

Finally, defendant argues that the record is difficult to review because the court reporter sometimes referred to jurors by their seat number and sometimes by their badge number. Defendant further worries that a reviewing court could not conduct a comparative analysis of jurors because of the lack of consistency. As defendant implies, when a reviewing court conducts a comparative analysis it is necessary to be able to distinguish the jurors to determine whether other strikes suggest racial animus underlay a challenged strike. (*People v. Trinh* (2014) 59 Cal.4th 216, 241-242.)

Although consistent reference to jurors would have been better and would have facilitated subsequent review of the proceedings, defendant has not shown the employed process requires the reversal of his convictions. In this case, a comparative analysis would not assist defendant because no other prospective juror stated that he or she has a tendency to prejudge people based on their appearance and the way they speak. A comparative

7

analysis would not support defendant's implicit claim that racial animus motivated the prosecutor to strike Juror No. 2544. The prosecutor's reason for striking the juror was not affirmatively contradicted by anything in the record (and defendant does not argue otherwise).

## 2. *Expert Witness*

The trial court limited the testimony of the defense expert Dr. Mcauliff, and defendant argues the court erred. """"Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]" [Citation.] It is true that "it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question." [Citation.] On the other hand, the expert's opinion may not be based "*on assumptions of fact without evidentiary support* [citation], *or on speculative or conjectural factors . . . .* [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?""" (*People v. Moore* (2011) 51 Cal.4th 386, 405, italics added by *People v. Moore*.)

### a. Background

Defense counsel sought to ask hypothetical questions regarding issues of suggestibility, memory, and forensic interviewing. In an effort to secure Dr. Mcauliff's further testimony, defense counsel argued: "Your Honor, I believe the defense is entitled to use hypothetical questions involving an expert, particularly when we have issues concerning what was going on with the babysitter. I think the defense is entitled to use hypotheticals when the babysitter makes comments or statements or told the jury that she had been talking to the child for at least two months before there was any disclosures."

The court responded, "If you take that out of context, as you've just done, that's one thing, but it wouldn't be proper in a hypothetical question. That's something the jury is going to have to sort out. [¶] As I remember the testimony, the testimony basically was, I had been asking her what's wrong for two months and she always said 'nothing. Nothing is wrong.' That's hardly suggestibility in any way, shape, or form." Essentially, the trial court disagreed with the factual basis for defense counsel's proposed hypothetical.

*b. Analysis*

The record supports the court's version of events, and contradicts defense counsel's version. Gonzalez testified that H. was dull after defendant moved into her mother's apartment. Although she asked H. what was wrong, it took H. months to tell her what happened. Specifically, Gonzalez asked H. "for about a month or two . . . what's wrong with you, and she wouldn't say anything . . . ." Gonzalez suspected H. was being bullied at school.

The record undermines defense counsel's argument because, as the trial court found, there was no evidence Gonzalez spoke to H. about defendant for two months prior to the disclosures. Further, defendant identifies no evidence that Gonzalez (or anyone else) asked H. misleading questions. Therefore defense counsel's proposed hypothetical question was not supported by any testimony in this case. The trial court properly concluded defense counsel could not pose hypothetical questions based on events unsupported by the testimony. (*People v. Moore, supra*, 51 Cal.4th at p. 404.)

**DISPOSITION**

The judgment is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.            RUBIN, J.

9