Filed 11/23/21  P. v. Shareef CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>QAYED MURTAZA SHAREEF,<br><br>     Defendant and Appellant. | G059364<br><br>(Super. Ct. No. 15HF0093)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Craig Robison, Judge.  (Retired Judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed and remanded with instructions.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

A jury convicted appellant Qayed Murtaza Shareef of a series of sex crimes against minors. Shareef argues the trial court erred in admitting statements he made to investigators because (1) he made those statements during a custodial interrogation without being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); and (2) his confession was involuntary. Shareef also challenges the imposition of certain fines and fees.

We remand this matter to the trial court with directions to modify the minute order and abstract of judgment to reflect the court's oral pronouncement staying the restitution fine. In all other respects, the judgment is affirmed.

## FACTS

In December 2013, 10-year-old J.D., who was autistic and had a learning disability, received a computer tablet as a gift. His mother downloaded several applications to the tablet, including an app called TangoMe, which allowed J.D. to message and video chat with other people online.

Within a matter of days, a person who identified himself as "Jeremy Stevens" began messaging J.D. through TangoMe; the child soon disclosed he was 10 years old. After exchanging messages about video games, music, and other topics, "Jeremy" and J.D. began to discuss pornography, and "Jeremy" described various sexual acts he wanted to perform on and with the child.

"Jeremy" then sent J.D. several videos of himself performing sexual acts, including a video of him wearing a blue GAP sweatshirt while masturbating and penetrating himself with what appears to be a glass sex toy. "Jeremy's" face was not

2

visible in the video. "Jeremy" also convinced J.D. to create and send him videos of himself masturbating and performing various sexual acts with his nine-year-old brother. J.D.'s mother soon discovered the messages and her sons' photographs and videos, and she contacted the police.

Law enforcement investigators were able to link "Jeremy's" IP address to the house in Aliso Viejo where Shareef had lived in 2013. Shareef, a husband and father of an infant son, was a marketing and advertising professional who at the time was making over $200,000 a year.

At about 7:00 a.m. on January 21, 2015, seven members of the Orange County Child Exploitation Task Force, which included both federal and local investigators, executed a search warrant at Shareef's house with guns drawn. After officers cleared the home, Orange County Sheriff's investigator Sandra Longnecker asked Shareef to read the search warrant; she then asked him if he wanted to talk to her. Shareef said he did. Longnecker suggested they talk in his garage, where she had set up some chairs and recording devices.

Longnecker, Shareef, and Ronald Perez, an agent from the Department of Homeland Security, entered the garage. Longnecker had Shareef sit closest to the door, so he could leave at any time. Perez asked Shareef, "You want me to close this door right here?" Shareef answered, "Yeah. Please close it." Longnecker then informed Shareef he was not under arrest and told him he was free to go at any time. Shareef acknowledged he understood ("I get it").

After asking some initial questions about Shareef's family members and living situation, Longnecker explained to him that authorities on the East Coast had contacted local law enforcement about two minor boys who were chatting on Tango. She added they were trying to find out who their suspect was, and they had traced the IP addresses for the "bad guy" to Shareef's old residence. She also shared they had

3

screenshots of the perpetrator wearing a blue GAP sweatshirt, but they did not have any face shots.

Shareef said he did not own a blue GAP sweatshirt and suggested that perhaps one of his brothers-in-law had committed the offenses. He added that agents might find the sweatshirt in the downstairs bedroom where his brother-in-law had stayed, but they would not find it in his (Shareef's) bedroom.

Shortly thereafter Shareef said that he was raped as a child by a friend of his father, and his wife did not know about it. Longnecker assured him that whatever they discussed would remain between them. Shareef said he wanted to make sure his son was not exposed to the same sort of abuse.

Shareef then asked if he had to get a lawyer. Longnecker replied, "Um, I mean no. I mean like I said you're, no one's under arrest or anything like that." She added they were just trying to figure out who the suspect was, and the victim's family only wanted an apology. Shareef responded he did not think his brother-in-law would admit to committing the crimes. He added that, considering how many people had stayed with him over the years, he wanted to make sure the investigation was "taken care of" and "done right." After asking Shareef some questions about his pornography preferences, Longnecker asked Shareef if he knew what a "glass toy" was. Shareef denied having any vibrators, glass sex toys, or dildos in the house.

Meanwhile, investigators were searching Shareef's home pursuant to the terms of the warrant. They found a blue GAP sweatshirt stored in a plastic bag in Shareef's bedroom closet, as well as a glass sex toy in Shareef's nightstand.

When she was made aware of these findings, Longnecker informed Shareef officers had found a blue GAP sweatshirt and a glass sex toy in his bedroom. She showed the items to Shareef, who claimed the sweatshirt belonged to his brother and the glass object was his wife's back massager. Longnecker told Shareef his wife said the sweatshirt belonged to him; Shareef responded that "she has a really bad memory."

4

Longnecker then asked Shareef whether he had ever inserted the glass massager into his anus. He admitted he had—that he occasionally penetrated himself with the glass object in the shower to try to understand the pain he experienced when he was raped as a child. He told Longnecker he needed to talk to a psychiatrist; she responded they could get him help. She then asked Shareef if he had ever videotaped himself using the glass massager, and he denied ever doing so.

Shareef asked what time it was. Longnecker replied it was almost 8:00 a.m. and asked if he needed something to eat or drink or to use the restroom. Shareef told her, "No. I'm okay."

Shareef then asked what was going to happen next. Longnecker informed him his electronics would be searched; the next steps would depend on what was found; all the information would be sent to prosecutors; if they identified the perpetrator, they would file criminal charges. Shareef asked what the charges would be, and Longnecker responded it depended on whether federal or state prosecutors filed the case.

Shareef again asked, "And I have to get an attorney?" Longnecker replied, "Um, it depends on if you're the, if you're the person that we're supposed to be talking to then it's up to you what you wanna do." She added they were still investigating the case. Longnecker and Shareef then discussed how Shareef could "get help for [his] issues."

Longnecker showed Shareef the video of the man masturbating with the glass massager in his anus; she then asked Shareef if that was him. Shareef was quiet for about 40 seconds before he replied, "I don't feel like I wanna answer that question." He explained it was "tough" for him because no one would understand his position; he said he never touched a child inappropriately and needed help to cope with his issues.

Longnecker told Shareef, "I don't think, when you made that video that you were trying to hurt anybody. I believe that you were trying to relieve the pain." Shareef answered, "I still—I know that pain is inside me." He then said he felt "worthless" and like "garbage."

5

Longnecker asked Shareef, "When you made that video did it release your pain?" Shareef answered, "Yes, it does, a little bit," but "right afterwards, I feel like . . . What did I do? What am I? What am I doing?" Longnecker asked him how many videos he made, and he answered, "like five." She then asked, "That's you wearing the sweatshirt?," and he answered, "Probably." He added that he blocks out memories because of his history of abuse.

Longnecker asked Shareef if he made the Tango account and sent the videos to J.D.; Shareef answered "Yes." He admitted he was sexually aroused by the videos J.D. sent him. He denied remembering the specific sexual acts he asked the children to perform, claiming his alter ego had taken over.

Longnecker informed Shareef they were contacting the district attorney, who would decide what would happen next. She explained that because there was a child in the home, they would either arrest Shareef or get a court order to remove him from the house. Shareef then specifically asked, "Should I get an attorney?" Longnecker answered, "That's totally up to you."

This conversation lasted about one hour and 45 minutes. At the end of the interview, Longnecker informed Shareef his wife might ask him questions when they exited the garage, and it was up to him what he told her. Shareef answered, "I just want to tell her everything." Longnecker told Shareef he could speak to his wife, but only in her presence, and the conversation had to be in English.

When Shareef encountered his wife, he told her, "I've done some bad things." He went on to explain that he had a disorder from being molested as a child, that his disorder prevents him from controlling himself, and that he chatted with boys on Tango and exchanged videos with them.

Longnecker accused Shareef of making excuses for what he had done and disagreed with him that being molested made people molest other children. Shareef was then arrested. He was at no time given any *Miranda* warnings before his arrest.

6

An information charged Shareef with committing lewd acts upon a child under 14 (Pen. Code,[1] § 288, subd. (a); counts 1-30), using a minor for sex acts (§ 311.4, subd. (c); count 31), and distributing pornography to a minor (§ 288.2, subd. (a)(1); count 32). The information further alleged Shareef had substantial sexual contact with a minor (§ 1203.066, subd. (a)(8)) and committed the offenses against more than one victim (§ 667.61, subd. (c)).

Prior to trial, Shareef moved to suppress all statements he made during the police interrogation, and the subsequent statements he made to his wife, asserting they were obtained in violation of *Miranda.* He also argued his statements were involuntary as they were coerced. The prosecutor countered that Shareef was not in custody when he made the statements, so *Miranda* warnings were not required, and further that Shareef's statements were voluntary.

The trial court denied Shareef's motion to exclude the statements. It explained it had considered the testimony related to Shareef's statements at length; the court read the transcripts and closely observed Shareef's behavior and responses during the interview. Based on this review, the court determined Shareef was not in custody when the statements were made so *Miranda* warnings were not required. The court also ruled Shareef's questions about whether he should get an attorney did not constitute clear invocations of his right to counsel under *People v. Crittenden* (1994) 9 Cal.4th 83. And, based on the totality of the circumstances before it, the court concluded Shareef's statements were voluntary.

At trial, the defense called Richard Ofshe, Ph.D., a social psychologist who studies police interrogations. According to Ofshe, investigators made both blatant and implied promises of leniency to Shareef when they told him they could get him treatment for his childhood abuse and when they represented that the victim's family just wanted an

---

[1]     All further undesignated statutory references are to this code.

7

apology. Ofshe also testified investigators used the blue GAP sweatshirt to make Shareef believe his situation was hopeless and motivate him to confess. Further, Ofshe noted that although Shareef agreed with the facts provided by the investigators, he did not provide any facts independent from what the investigators told him, and thus his confession was "contaminated." Ofshe was paid roughly $10,000 by the defense for his services on the case.

The jury found Shareef guilty on all charges, found true all allegations of substantial sexual contact, and found true the multiple victim allegation on counts 11 through 19. The trial court sentenced Shareef to 25 years to life on count 11, imposed concurrent sentences on all other counts, and ordered Shareef to pay certain fines and fees. Shareef filed a timely notice of appeal.

## DISCUSSION

1. *The Interview Was Not Custodial*

Shareef first argues the trial court erred in admitting his interview with investigators because he was legally in custody when it occurred, and he was not advised of his *Miranda* rights. We find no reversible error.

Once in custody, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479.) However, "police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)

8

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).)

"A more comprehensive, although not exhaustive, list of relevant circumstances includes 'whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.'" (*People v. Potter* (2021) 66 Cal.App.5th 528, 539-540.)

"No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a

9

coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

"'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave" [citation].'" (*Moore, supra*, 51 Cal.4th at p. 395.)

This is a close case on the *Miranda* issue. Applying the applicable factors here, we conclude this interview began as a non-custodial conversation between Shareef and the case investigators. Shareef voluntarily agreed to talk after reading the search warrant; he asked the investigators to close the door, apparently for privacy, after they entered his own garage ("Please close it"). The interview took place on his property, not at a police station. Before starting the interview, the investigators informed Shareef he was not under arrest and he was free to leave at any time; he acknowledged he understood that ("I get it"). There were no significant restrictions on his freedom of movement during the interview. Investigators seated Shareef near the door so he could get up and leave at any time.

The subsequent interview lasted less than two hours. Midway through it, an investigator asked Shareef if he needed to use the restroom or wanted anything to eat or drink, and Shareef declined ("I'm okay"). Two officers participated in the interview; they were generally calm, professional, and at times even appeared sympathetic. The conversation was largely free flowing, with the investigators asking questions and Shareef responding. Shareef sometimes redirected the discussion and volunteered

10

information.  All of these factors support the Attorney General's argument that the interview was non-custodial.

On the other hand, a number of relevant factors weigh in favor of a finding this was a custodial interrogation from the outset.  The contact with Shareef was initiated by law enforcement early in the morning at his home.  Investigators had their weapons drawn as they executed the search warrant.  Shareef was apparently a suspect from the beginning, not just a witness.  He asked repeatedly during the interrogation about whether he had to or should get a lawyer.  And Shareef was arrested at the conclusion of the interrogation.

As we observed above, this is a close case.  On balance, however, after applying the "deferential substantial evidence standard" of review which the law requires of us (*Moore, supra*, 51 Cal.4th at p. 395), we agree with the trial court.  We believe a reasonable person in Shareef's position would have felt free to terminate the questioning up until the time he was placed under arrest.

Shareef's subsequent statements—those made in the presence of his wife— are a different matter.  After the investigators informed Shareef he would either be arrested or they would get a court order to remove him from the house, any further conversation involving Shareef, his wife, and Investigator Longnecker clearly became a custodial interrogation, thus requiring *Miranda* warnings.  Accordingly, the trial court should have excluded those statements.

We nonetheless find the admission of those statements harmless beyond a reasonable doubt, as other evidence lawfully obtained before Shareef spoke to his wife confirmed Shareef had committed the crimes in question.  Specifically, the perpetrator's IP address had been tied to Shareef's house; the blue GAP sweatshirt and glass sex toy seen in the video were recovered from Shareef's bedroom; his wife confirmed the blue GAP sweatshirt belonged to Shareef; and toward the end of the initial interview, before it

11

became a custodial interrogation, Shareef admitted he had made the videos and sent them to J.D. via Tango. Accordingly, we find no reversible error.

2. *The Confession Was Not Coerced*

Shareef further contends his interview should have been excluded because investigators coerced his confession through deceptive interrogation tactics, such as offering him leniency, telling him the victim's family only wanted an apology, suggesting Shareef did not need an attorney, and agreeing to get him help for his psychological problems.

"The due process clause of the Fourteenth Amendment to the United States Constitution bars the admission of 'any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion.' [Citation.] So when the police obtain a suspect's statements 'by "techniques and methods offensive to due process . . .' . . . or under circumstances in which the suspect clearly had no opportunity to exercise "a free and unconstrained will,"' the statements are inadmissible." (*People v. Mendez* (2019) 7 Cal.5th 680, 698.)

In considering whether a defendant's confession was voluntary, we consider the totality of the circumstances and examine whether a statement was the product of an essentially free and unconstrained choice, or whether coercion overbore his or her will and critically impaired his or her capacity for self-determination. (*People v. Flores* (2020) 9 Cal.5th 371, 426 (*Flores*).) No single factor is dispositive; relevant factors include the nature of any coercive conduct by law enforcement, the length and location of the interrogation, and the defendant's maturity, education, physical condition, and mental health. (*People v. Williams* (2010) 49 Cal.4th 405, 436.) "'Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked.'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.) Although "'*Miranda* forbids coercion, [it does] not [forbid]

mere strategic deception by taking advantage of a suspect's misplaced trust.'" (*People v. Tate* (2010) 49 Cal.4th 635, 686.)

We review the trial court's resolution of any disputed facts and inferences and its evaluations of credibility for substantial evidence; we independently determine from the undisputed facts whether the challenged statement was legally obtained. (*Flores, supra,* 9 Cal.5th at p. 418.) The facts surrounding a confession are undisputed to the extent the interview is tape-recorded. (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.)

Applying those standards, we discern no error in the trial court's finding that Shareef's confession was voluntary. He agreed to the interview after reading the search warrant. The interview took place immediately thereafter in his own garage. At the beginning of the interview, Shareef, who was a marketing professional earning a substantial income at the time, expressed his desire to make sure the investigation was "taken care of" and "done right." He thereafter actively participated in the interview, directing investigators to possible suspects, asking questions, volunteering information, and at times even steering the conversation.

Investigators utilized legally permissible interview techniques, such as expressing sympathy, establishing a rapport, letting Shareef think they believed his claims, and showing him the evidence they had obtained during the course of their investigation. They maintained a professional tone, discussed with Shareef the information they had and did not have, answered his questions, listened to his responses and concerns, told him they were not personally judging him, and seemed sympathetic when he brought up his claims that he was molested as a child.

The investigators did speak to Shareef about getting him help for his childhood trauma; they also told him the victim's family just wanted an apology. But the investigators also informed Shareef they would arrest and prosecute the "bad guy" once they identified him, and Shareef indicated he understood that before he incriminated

13

himself. In our view, the investigators' responses to Shareef's questions about whether he needed an attorney did not cause him to confess; rather, as is often the case, the record suggests that, once he was confronted with all the inculpatory evidence that had already been collected by the investigators, Shareef determined that his initial story was no longer viable, and his admissions followed.

3.   *Fines and Fees*

Shareef's remaining arguments concern the imposition of fines and fees. He first asserts the sentencing minute order and abstract of judgment do not conform to the trial court's oral pronouncement of sentence and therefore must be modified. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls"].) Shareef is correct in part.

According to the reporter's transcript from the sentencing hearing, the trial court ordered "the minimum statutory fines and fees, including the minimum restitution fund fine, which in 2013 was $280," but "stay[ed] collection of that restitution fine unless and until there is an ability to pay hearing." The court also "impose[d] the minimum parole revocation restitution fine, [but] stay[ed] its collection pending any violation of parole in the event that he is paroled and an ability [to pay] hearing has been held."

The sentencing minute order and abstract of judgment reflect the imposition of a $280 restitution fine under section 1202.4, subdivision (b) (without mentioning any stay); a $280 parole revocation restitution fine under section 1202.45, which was suspended unless parole is revoked; a $1,280 court security fee ($40 per count) under section 1465.8; and a $960 criminal conviction assessment ($30 per felony) under Government Code section 70373.

Shareef asks us to modify the sentencing minute order and abstract of judgment to reflect the stay of the two restitution fines in accordance with the trial court's oral pronouncement of sentence. The Attorney General agrees that the minute order and

14

abstract of judgment should be modified to reflect the stay of the restitution fine under section 1202.4, subdivision (b); we therefore remand the matter so that modification can be made. However, both documents accurately reflect the court's suspension of the parole revocation restitution fine under section 1202.45, stating that fine was "suspended" unless parole "is revoked." We therefore deny Shareef's request to make any modifications concerning the parole revocation restitution fine.

Shareef next contends the trial court's decision to stay the restitution fines pending an ability to pay hearing logically suggests the court also intended to stay the imposition of the court security fee and criminal conviction assessment fee pending such a hearing, noting those fees totaled $2,240, nearly 10 times the restitution fee. The record does not support that argument. Although the court stated it would stay certain "fines," it expressed no intent to stay the statutory fees. We decline Shareef's invitation to read words into the record.

Shareef alternatively argues the fines and fees must all be stayed because they are unconstitutional under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which held that trial courts must conduct an ability to pay hearing and ascertain a defendant's present ability to pay before imposing court facilities and court operations assessments. Shareef forfeited his *Dueñas* challenge, however, by failing to raise it in the trial court. (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054 [collecting *Dueñas* forfeiture cases].) And even if he had not forfeited the issue, *Dueñas* is easily distinguishable. Unlike the destitute defendant[2] in *Dueñas*, Shareef was making over

[2] In *Dueñas*, the defendant was a probationer who suffered from cerebral palsy, was unemployed and unable to work, homeless, and the mother of young children. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160-1161.) Her earlier failure to pay several juvenile traffic citations resulted in the suspension of her driver's license, which then led to a series of misdemeanor convictions over the years for driving with a suspended license, and even more court fines and fees. (*Id.* at p. 1161.) While she often served time in jail in lieu of paying her fines, Dueñas was still ordered to pay the related mandatory court fees. (*Ibid.*) As a result, she found herself deep within a cycle of repeated penal

15

$200,000 a year during the seven years leading up to his arrest, he had the ability to retain private counsel at trial, and he paid an expert about $10,000 to testify in his defense. The compelling concerns raised in *Dueñas* are therefore inapplicable here.

## DISPOSITION

The matter is remanded to allow the trial court to modify the minute order to reflect the stay of the restitution fine under section 1202.4. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

GOETHALS, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MARKS, J.*

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

consequences, all of which stemmed from her initial inability to pay fines assessed when she was a juvenile. The appellate court found that imposing fees and fines on Dueñas was unconstitutional and violated due process, holding: "Because the only reason Dueñas cannot pay the fine and fees is her poverty, using the criminal process to collect a fine she cannot pay is unconstitutional." (*Id*. at p. 1160.)