Filed 1/28/25  P. v. Galvanrodriguez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082212 |
| v. | (Super. Ct. No. FVI21000824) |
| AURELIO GALVANRODRIGUEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael Dauber, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers, Amanda Lloyd, and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendant and appellant Aurelio Galvanrodriguez appeals the trial court's judgment after a jury convicted him of three counts arising from his sexual assault of a minor. He contends (1) the trial court erred by denying his motion to suppress his incriminating statements to law enforcement, (2) substantial evidence does not support one of the counts, and (3) the trial court improperly imposed fines and fees without considering his ability to pay them. We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.R., born in 2009, lived in the same house as defendant between 2012 and 2017. Defendant's charges arise from three incidents where he inappropriately touched A.R.

The first incident occurred when she was four years old. She was in the jacuzzi with defendant when he grabbed her by the waist, pulled her towards him, and tried to touch her genitals by brushing his hand over her swimsuit just above her genital area below her belly button. In response, A.R. kicked defendant and got out of the jacuzzi.

On another occasion, when she was about five years old, A.R. was in the pool when defendant came over and tried to touch her again. He touched her upper inner thighs and moved his hand upwards towards her genital area.

The next incident also occurred when A.R. was five years old. Defendant entered her room while she was sitting on the floor watching TV, closed the door behind him, and

2

then grabbed A.R., pushed her down hard, pulled her pants and underwear down, and started licking her genital area. He forcefully held her down by the hips and continued to orally copulate her for a minute or two.

A jury convicted defendant of committing lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (a); counts 1 & 3)[1] and oral copulation with a child 10 years or younger (§ 288.7, subd. (b); count 2). The trial court sentenced him to 10 years, plus 15 years to life.

III.

DISCUSSION

A. *Motion to Suppress*

1. *Background*

A.R. reported defendant's conduct to her father, who in turn reported it to law enforcement. After speaking with A.R., Sheriff's Deputy Ramos spoke to defendant at his home. Defendant and his wife invited Deputy Ramos inside. Deputy Ramos told defendant that he did not have to speak with A.R. and that he was not under arrest, but she was investigating A.R.'s accusation that defendant molested her. Defendant agreed to speak with Deputy Ramos, but the record is silent as to their specifics of their conversation, including how long it lasted.

---

[1] All further statutory references are to the Penal Code.

At some point, Deputy Ramos asked defendant to take a voluntary polygraph exam at the station. Defendant agreed, and he and his wife then followed Deputy Ramos to the station in their own car.

Upon arriving at the station, Deputy Ramos reiterated that the polygraph exam was voluntary and defendant did not have to take it, but he agreed to. Michelle Cooley administered the exam while Deputy Ramos observed it from another room. Before taking the test, defendant signed a consent form, which explained that the test was voluntary. Cooley explained the form to defendant and asked if he had questions. He said he did not. Cooley also told defendant the door was not locked and he was free to leave at any time.

Cooley chatted with defendant before addressing A.R.'s allegations. She mostly asked defendant questions about himself, including about his life, his relationships past and present, his interests, his health, and his sexual history. Cooley also asked defendant about his relationship with A.R., whether he had ever inappropriately touched her, and her accusations against him.

According to Deputy Ramos, Cooley talked with defendant for almost an hour and a half "to build rapport" before administering the polygraph exam. Cooley asked defendant a series of yes/no questions, some of which concerned whether he molested A.R. Cooley told defendant he was failing the test and not truthfully answering the questions about A.R. Cooley continued to ask defendant questions about whether, when, and where he inappropriately touched A.R. and consistently implored him to tell the truth.

4

Eventually, defendant admitted he had inappropriately touched A.R. on multiple occasions and demonstrated three different ways he had done so.

Defendant told Cooley that "if the interview was done, he would like to go." Cooley told defendant that she had to go talk to Deputy Ramos about what defendant had told her and that she would come back shortly.

Cooley returned to the interview room with Deputies Ramos and Quezada, informed them that defendant had admitted to molesting A.R., and repeated the demonstrations defendant had performed. Defendant confirmed that the demonstrations were accurate.

Deputy Ramos told defendant they were going to keep talking to him. Defendant complained of having a headache and that he was worried about his wife. The deputies offered him food and water. Deputy Ramos reminded him that he was not arrested, that he could go whenever he wanted, and that he did not have to talk to her. When Deputy Ramos asked if defendant wanted to talk to her and Deputy Quezada, defendant said that he did. Defendant then confirmed what he had told Cooley, and the deputies continued interviewing him. At the end of the interview, which was about eight hours after Deputy Ramos went to defendant's house, the deputies placed defendant under arrest and placed him in a holding cell.

Defendant moved before trial to exclude his statements made to Cooley, Ramos, and Quezada on the ground that he was in custody and thus he had to receive *Miranda* advisements. The People opposed the motion, arguing that defendant was never in

5

custody and so he did not have to be *Mirandized*. The trial court agreed with the People, denied defendant's motion to suppress, and admitted his statements at trial.

2. *Applicable Law and Standard of Review*

A suspect must receive *Miranda* warnings before being subjected to a *custodial* interrogation. (*Miranda v. Arizona* (1966) 384 U.S. 436, 444 (*Miranda*).) "An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present. [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).)

Courts have identified numerous relevant circumstances to consider when deciding whether a suspect not under arrest is nonetheless in custody for *Miranda* purposes. (*People v. Potter* (2021) 66 Cal.App.5th 528, 539 (*Potter*).) These include: "[1] whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; [2] whether the express purpose of the interview was to question the person as a witness

6

or a suspect; [3] where the interview took place; [4] whether police informed the person that he or she was under arrest or in custody; [5] whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; [6] whether there were restrictions on the person's freedom of movement during the interview; [7] how long the interrogation lasted; how many police officers participated; [8] whether they dominated and controlled the course of the interrogation; [9] whether they manifested a belief that the person was culpable and they had evidence to prove it; [10] whether the police were aggressive, confrontational, and/or accusatory; [11] whether the police used interrogation techniques to pressure the suspect; and [12] whether the person was arrested at the end of the interrogation." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

When, as here, the trial court's finding that the defendant was not in custody turns on undisputed facts, we "'independently decide whether . . . "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave." [Citation.]'" (*Moore*, *supra*, 51 Cal.4th at p. 395.)

C. *Analysis*

Defendant is correct that a number of circumstances here could suggest that he was in custody for *Miranda* purposes. These include: (1) the fact that Deputy Ramos initiated contact with defendant, (2) the interviews took several hours over the span of about eight hours, (3) the interview took place in an interrogation room at a police station, (4) law enforcement outnumbered defendant (although Cooley interviewed

7

defendant by herself for the most part), (5) Cooley and the deputies confronted defendant with evidence of his guilt (A.R.'s accusations), and (6) defendant was arrested at the end of the interview.

On the other hand, however, a number of circumstances suggested that defendant was not in custody. Although Deputy Ramos started the interview by going to defendant's house, he voluntarily drove himself to the police station. And although the interview took place in an interrogation room, defendant was informed (truthfully) that the door was not locked.

More importantly, however, defendant was repeatedly and expressly told at least three times he was not under arrest and that he was free to go at any time, which is "perhaps the most significant [factor] for resolving the question of custody." (*United States v. Crawford* (9th Cir. 2004) 372 F.3d 1048, 1060.) Deputy Ramos told defendant at his house that he did not have to talk to her or come to the station. When he arrived at the station, Deputy Ramos reiterated that defendant was not under arrest and did not have to talk. Cooley had defendant sign a consent form before taking the polygraph exam and made clear that defendant could leave at any time and did not have to take the exam. When Deputy Ramos returned to the interrogation room after Cooley summoned her, Deputy Ramos reiterated for a third time that defendant was free to leave and did not have to talk, yet he said he wanted to keep talking.

We acknowledge that "'[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial

8

per se,'" and that "[w]e must consider the delivery of these statements within the context of the scene as a whole.'" (*People v. Saldana* (2018) 19 Cal.App.5th 432, 457 (*Saldana*).)

In *Saldana*, for instance, the defendant voluntarily agreed to be questioned, was not handcuffed, was questioned by only one detective, and was told that he was not under arrest and was free to leave, yet the court still held the defendant was in custody. (*Saldana*, *supra*, 19 Cal.App.5th at pp. 457-458.) This was because the detective used persistent, confrontational, and accusatory interrogation techniques, insisted that defendant was guilty, disregarded the defendant's denials and suggested that the defendant would "in some way feel better or benefit if he confesse[d], such as appealing to less morally culpable reasons for committing the offense." (*Id*. at p. 460.) The interrogating officer's "unrelenting number of accusatory questions," coupled with his refusal to "take no for an answer," "conveyed the message that [the defendant] had no meaningful choice but to admit to some version of the crime because continued denials— in light of the extensive and irrefutable evidence against him—was simply futile. [By] [i]nsisting on the 'truth' until [the defendant] told [the detective] what he sought, the objective message conveyed was that [the defendant] would be interrogated until he admitted touching the girls." (*Id*. at pp. 1457, 1460.)

*People v. Torres* (2018) 25 Cal.App.5th 162, involves a similar scenario. There, "the detectives went further than the detective in *Saldana*, essentially telling Torres they would not leave, and Torres could not return home, until Torres stopped lying and

confessed to what the detectives could prove scientifically with the DNA test running in the trunk." (*People v. Torres*, *supra*, at p. 179.)  The Court of Appeal held that "[a] reasonable person in Torres's position—believing that a DNA test was running in the trunk and essentially being told he could not leave until he told the detectives what they claimed they could already prove—would not have felt at liberty to terminate the interrogation, open the car door, and leave." (*Ibid*.)

Our Supreme Court's decision *Moore*, *supra*, 51 Cal.4th at pages 394-395, provides an illustrative contrast.  The *Moore* defendant was first interviewed at his home and then agreed to go to the station to give a formal statement.  (*Id*. at p. 391.)  He rode in the back of a patrol car to the station and was taken to an interrogation room.  (*Ibid.*)  Like defendant here, the *Moore* defendant was not handcuffed or otherwise restrained at any point, and he was told at the beginning of the interview that he was not under arrest and was free to leave at any time.  (*Ibid*.)  After being asked pointed questions for nearly two hours that suggested he was a suspect, the defendant asked to be taken home.  (*Ibid*.)

Our Supreme Court held the defendant was not in custody for *Miranda* purposes.  (*Moore*, *supra*, 51 Cal.4th at pp. 402-403.)  The court reasoned:  "[The questioning officer] expressly told defendant he was not under arrest and was free to leave.  Defendant said he understood.  Defendant was not handcuffed or otherwise restrained, and there was no evidence the interview room door was locked against his leaving.  The interview was fairly long—one hour 45 minutes—but not, as a whole, particularly intense or confrontational." (*Id*. at p. 402.)

Following *Moore*, the *Potter* court held that the defendant was not in custody under similar circumstances. "As in [*Moore*], defendant went to the police station voluntarily. He did so to take a polygraph examination, apparently in the hope of passing the examination and thereby convincing law enforcement that he did not molest his daughter." (*Potter*, *supra*, 66 Cal.App.5th at p. 541.) Once in the interview room, the investigating officer told the *Potter* defendant "'you don't have to talk to me if you don't want,'" and "'[y]ou can stop this anytime you want and walk out, there's the door,'" which was not locked. (*Ibid*.) Like the *Moore* defendant, the *Potter* defendant "was not handcuffed or otherwise restrained," nor was the interview "'particularly intense or confrontational.'" (*Ibid*.)

This case is more like *Moore* and *Potter* than *Saldana* and *Torres*. Like the defendants in *Moore* and *Potter*, defendant voluntarily went to the police station. And like those defendants, defendant talked to Cooley without handcuffs or restraints and the deputies despite repeated admonitions that he did not have to, he was not under arrest, and he was free to go at any time. And throughout the interview, Cooley and Ramos asked defendant multiple times if he needed water or food, and asked about his medical and dietary needs (if any). (See *People v. Peoples* (2016) 62 Cal.4th 718, 740-741 [finding a 12-hour interrogation did not amount to coercion where defendant was provided with food, drinks, and breaks upon request].)

11

Although defendant argues it was a police-dominated environment, he does not suggest the interview was intense, confrontational, or aggressive. We discern nothing in the record indicating that the interviewers' tone, tenor, or statements suggested that defendant was not free to leave, particularly given that they repeatedly told defendant that he was free to leave and did not have to talk. (See *Howes v. Fields* (2012) 565 U.S. 499, 515 [defendant not in custody when told before and during interview that he could leave].)

In short, under the totality of the circumstances, a reasonable person would have felt free to leave at all relevant times, including up to when Cooley relayed defendant's statements and demonstrations to Deputy Ramos in defendant's presence. As a result, we conclude the trial court correctly found that defendant was not in custody for *Miranda* purposes. The court therefore properly denied his motion to suppress.

B. *Count One*

Defendant next contends his conviction in count 1 should be reversed for lack of substantial evidence. In his view, there is not substantial evidence that he committed the act with sexual intent. We disagree.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of

12

the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Thus, "'[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) We may reverse a conviction for a lack of substantial evidence only if it appears "'"that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

A person is guilty of committing lewd conduct with a minor if they "willfully and lewdly commit[] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of that person or the child." (§ 288, subd. (a).) "[A] touching, even one innocuous or inoffensive on its face, done with lewd intent" violates section 288. (*People v. Lopez* (1998) 19 Cal.4th 282, 290.)

13

The basis for count 1 was defendant's conduct in the jacuzzi when A.R. was four. According to A.R., she and defendant were in the jacuzzi when he grabbed her by the waist, pulled her toward him, and tried to touch her genital area by brushing his hand over her swimsuit above her genital area but below her belly button. She testified that he "tried pulling [her] in to . . . touch me in my private area." She then kicked defendant to get him away because she "knew what he was trying to do," and thought that kicking him would help her "get away from" him and "get to the other side [of the jacuzzi] faster."

In other words, A.R. unambiguously testified that she kicked defendant to get away from him because she believed he was trying to touch her genital area. From this testimony alone, the jury could reasonably find that defendant had the requisite sexual intent necessary for a section 288 violation. (See *People v. Martinez* (1995) 11 Cal.4th 434, 445.) We therefore reject defendant's argument that his conviction in count 1 lacks substantial evidence.

C. *Fines and Fees*

As part of defendant's sentence, the trial court imposed a $10,000 victim restitution fee, a court operations fee of $70 per count (for $210 total), and a $30 court construction fee. Defendant argues the trial court erred in doing so without considering his ability to pay the fine and fees. We disagree.

To the extent defendant argues the trial court erred in failing to hold an ability-to-pay hearing, he forfeited the issue by failing to request a hearing in the trial court. (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053-1054.) Defendant instead only

objected to the trial court's imposition of any fine or fee based on his alleged inability to pay.

As for the $10,000 restitution fine, the trial court may impose a restitution fine even if the defendant cannot pay it. (*People v. Potts* (2019) 6 Cal.5th 1012, 1056.) The court should also consider "the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime." (§ 1202.4, subd. (d).) Inability to pay is only one "factor for the court to consider in setting the amount of a restitution fine, alongside 'any relevant factors.'" (*People v. Potts*, *supra*, at p. 1056.) "The court was permitted to conclude that the monetary burden the restitution fine imposed on defendant was outweighed by other considerations." (*Id*. at pp. 1056-1057.) Given the gravity of defendant's offenses—multiple sex offenses against a young child—the trial court here permissibly found that defendant should pay the maximum restitution fine.

As for the $240 in fees, the trial court reasonably found that defendant could afford to pay them. Defendant reported making $500 to $900 per month and jointly owned a home with his wife, which the court noted was a "significant asset[]." His income and assets, coupled with the fact that defendant can work while serving his

lengthy sentence, provided ample reason for the court to conclude defendant has the ability to pay the $240 in fees.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
    Acting P. J.

RAPHAEL
    J.

16